R. J. Nicoll Co., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Raymond Nicoll and Genevieve Nicoll, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 1759–69, 1760–69. Filed October 5, 1972.

*Julie M. Reardon,* for the petitioners.
*Frederick B. Strothman,* for the respondent.

Hoyt, *Judge:* The Commissioner determined deficiencies in the income tax of petitioner R. J. Nicoll Co. for the taxable year April 1,

1965, to December 31, 1965, in the amount of $1,557; for the taxable year 1966, in the amount of $2,083; and for the taxable year 1967, in the amount of $1,475. The Commissioner determined deficiencies in the income tax of petitioners Raymond Nicoll and Genevieve Nicoll for the taxable years 1965 and 1967 in the amounts of $7.78 and $116, respectively.

These cases were consolidated for all purposes upon joint motion of the parties. As certain issues have been conceded by the respective parties, the remaining issues for our decision are: (1) Whether amounts paid by petitioner corporation to Raymond Nicoll as compensation in the taxable year April 1, 1965, to December 31, 1965, and the taxable years 1966 and 1967, in excess of those amounts allowed by respondent, constituted reasonable compensation deductible by the corporation and includable in Raymond Nicoll's gross income as compensatory income, or whether such amounts were nondeductible dividends with respect to the corporation, includable in Raymond Nicoll's gross income as dividends; (2) whether amounts paid by the corporation in the taxable year April 1, 1965, to December 31, 1965, and the taxable years 1966 and 1967, in excess of the amounts allowed by respondent as the employer's share of the social security tax for those years is deductible by the corporation as payment of the employees' share of the social security tax for those respective years; (3) whether or not Raymond Nicoll overreported his gross income for the year 1965 by the amount of $3,000.

#### FINDINGS OF FACT

Some of the facts have been stipulated, and such stipulated facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner R. J. Nicoll Co. (hereinafter sometimes referred to as the corporation) is a Colorado corporation, having its principal place of business in Denver, Colo., at the time it filed its petition herein and at all other times herein pertinent. Petitioner corporation filed its Federal income tax returns with the district director of internal revenue, Denver, Colo., for the taxable year April 1, 1965, to December 31, 1965, and for the taxable years 1966 and 1967.

Petitioners Raymond Nicoll and Genevieve Nicoll (hereinafter sometimes referred to as Raymond and Genevieve, respectively) are individuals, husband and wife, and resided at Denver, Colo., at the time they filed their petition herein. Petitioners Raymond and Genevieve filed their joint Federal income tax returns with the Internal Revenue Service for the taxable years 1965, 1966, and 1967.

In 1932, Raymond and his brother, Willard Nicoll, commenced business together. During the period between 1932 and sometime in 1952, they conducted their business through a corporation known as Nicoll

Brothers Oil Co. Raymond and Willard each owned 50 percent of the stock therein.

Nicoll Brothers Oil Co. represented various national oil companies as distributors or jobbers in the Denver area. In addition, Nicoll Brothers Oil Co. acquired raw land and constructed gasoline service stations thereon.

Sometime around 1952, Raymond and Willard, acting on behalf of Nicoll Brothers Oil Co., sold its interests in the gasoline distributorships. The purchasers in that transaction also acquired the name Nicoll Brothers Oil Co. The corporate name of Raymond's and Willard's business was then changed from Nicoll Brothers Oil Co. to Nicoll, Inc., to continue in the construction business. Raymond and Willard maintained their interests as equal stockholders in Nicoll, Inc.

During the ensuing years, Nicoll, Inc., continued actively in its construction business, with Raymond and Willard as the primary employees, in addition to being the owners.

In their construction activities as employees of both Nicoll Brothers Oil Co. and Nicoll, Inc., Raymond and Willard managed the building of between 150 and 200 service stations in the Denver area, their company retaining some of them and selling some of them to national oil companies. Most of the service stations were sold. Those retained were leased. The construction of the service stations was financed through loans from a Denver bank. Somewhere between 50 and 100 loans were obtained, ranging between $50,000 and $100,000 each. All of the corporate loans were individually guaranteed by Raymond and Willard.

As employees of Nicoll, Inc., Raymond and Willard each worked long and arduous hours. They often worked from daylight to dark, 6 or 7 days a week. As officers and employees of Nicoll, Inc., both Raymond and Willard received salaries ranging from $9,000 per year in early years to $12,000 per year in the later years up until 1965.

During the period of expansion and development of the business, and up until 1965, the brothers did not attempt to set salaries commensurate with their efforts, the reasonable value of the services rendered, or the success of their enterprise. They maintained a policy of leaving as much money in the corporate pocketbook as they could in order to preserve funds for corporate operations and investments. For this reason they drew salaries substantially below the level of the value of their services for many years, such services being reasonably worth from $15,000 to $18,000 each year. However, there was no formal agreement, either between the brothers themselves or between the brothers and the company, as to when or how they would eventually make up this inadequate compensation. There was a general understanding that later on they would make it up to themselves from the business.

In 1965, Nicoll, Inc., was "split-up." Since Raymond and Willard then each owned 50 percent of the stock, 50 percent of the corporate

assets was transferred to a new corporation, R. J. Nicoll Co. (the corporate petitioner in this case), and approximately 50 percent of the assets remained in Nicoll, Inc. R. J. Nicoll Co. began its corporate existence with retained earnings of $70,603, its share of the earned surplus and undivided profits of the predecessor corporation, Nicoll, Inc. Willard acquired all of the stock of Nicoll, Inc., and Raymond became the sole stockholder of R. J. Nicoll Co. Raymond also became an officer and director of R. J. Nicoll Co.[1]

In 1965 when Nicoll, Inc., was "split-up," R. J. Nicoll Co. (Raymond's corporation) acquired the following real estate properties:

| Location | Location |
|---|---|
| Larimer & Downing Streets | 1800 East Evans Avenue |
| 8th and Elati | 4414 W. 46th Avenue |
| 23rd Street & Oneida | 69th & Kearney |
| 535 E. Mexico | Kalamath & Oxford Streets |
| 1790 S. Broadway | 44th and Holland Streets |
| 10th & Federal Streets | |

The properties located at Kalamath and Oxford Streets, and 44th and Holland Streets consisted of unimproved land. The Larimer and Downing Streets property had an old service station situated thereon which was removed; the property subsequently was leased as a used-car lot and a small metal building was constructed thereon. This arrangement faltered, however, the tenant vacated, and the property was not thereafter leased.

R. J. Nicoll Co. did not own the building or fixtures located at the 1800 East Evans Avenue location, but owned the land upon which the building and fixtures were situated.

All the other properties had gasoline service stations situated thereon and were leased out by the corporation. All of the tenants leasing from the corporation were major oil companies. The corporation experienced no difficulties collecting rents from them, and rents were always paid timely. The leases were generally for terms ranging from 5- to 10-year periods. However, decisions as to leasing had to be made, and in at least one instance a sale of corporate property was arranged and consummated.

During the years 1965, 1966, and 1967, Raymond's duties and responsibilities as president of R. J. Nicoll Co. essentially were concerned with the management of the corporation's service stations. All corporate decisions were made by Raymond. R. J. Nicoll Co. employed one other employee, Barbara Saull, Raymond's daughter. She assisted

---

[1] Subsequently, during the years in issue, Raymond made a series of gifts of shares of stock in the corporation to Genevieve and his daughter, Barbara Saull, so that as of 1967 Raymond owned 62 percent of the stock, Genevieve 19 percent, and Barbara 19 percent. Genevieve and Barbara were also directors of the corporation.

Raymond in managing the various rental properties of the corporation, and performed other services as requested by him. Genevieve, although not an employee of the corporation, also assisted Raymond; she kept the day-to-day books of record of the corporation, paid all of the bills, and was generally in charge of the checks and deposits of the bank account. All of the corporate records were kept at Raymond's home; the corporation maintained no other office.

During the years 1965, 1966, and 1967, Raymond did not make very frequent or extended visits to the service station properties in connection with his management function, and those operators and employees at the service stations that were visited saw Raymond only rarely. He made visits whenever necessary to check on conditions, make sure that lease terms were being complied with, and attend to maintenance and repairs.

The corporation as lessor was responsible for certain repairs to some of the service stations relative to the gutters, driveways, curbs, plumbing, heating, and windows. Rather than actually make the repairs himself, Raymond would make arrangements and contracts for the services of plumbers, electricians, roofers, and others to do the actual work on behalf of the corporation.

Notwithstanding his 30 some years of experience in the field of constructing, selling, leasing, supervising, and managing gasoline service stations, and also his prior experience in distributing and jobbing for major oil companies, Raymond provided little management advice with respect to the operations of the service stations. The operators generally looked to the oil company lessees for such assistance, not to R. J. Nicoll Co., the lessor.

On its corporate income tax returns, R. J. Nicoll Co. claimed deductions for compensation paid to Raymond, its president, and to its only other employee, Barbara Saull, in the following amounts:

| Year | Raymond Nicoll | Barbara Saull |
|---|---|---|
| Apr. 1, 1965, to Dec. 31, 1965 | $11,500 | $1,200 |
| 1966 | 15,000 | 1,815 |
| 1967 | 11,500 | 1,800 |

During the years before the Court, R. J. Nicoll Co. never declared or paid a dividend.

In his statutory notice determining a deficiency in the income tax of the corporation, respondent disallowed the following payments to Raymond as unreasonable compensation:

| Year | Compensation paid | Amount allowed as deduction | Amount disallowed as deduction |
|---|---|---|---|
| Apr. 1, 1965, to Dec. 31, 1965 | $11,500 | $4,890 | $6,610 |
| 1966 | 15,000 | 6,200 | 8,800 |
| 1967 | 11,500 | 6,100 | 5,400 |

Respondent's determination of what constituted reasonable compensation by R. J. Nicoll Co. to Raymond was based on the following schedule:

| | Apr. 1, 1965, to Dec. 31, 1965 | 1966 | 1967 |
|---|---|---|---|
| Gross income from rentals | $24,450 | $31,000 | $27,950 |
| Capital gain—sale of service stations | | | 8,500 |
| Allowed: | | | |
|   Management fee—10 percent of gross rental | 2,445 | 3,100 | 2,795 |
|   Lease procurement fee—10 percent | 2,445 | 3,100 | 2,795 |
|   Commission on sale of stations—6 percent of selling price | | | 510 |
|     Total allowable reasonable compensation | 4,800 | 6,200 | 6,100 |
| Compensation claimed | 11,500 | 15,000 | 11,500 |
| Disallowed | 6,610 | 8,800 | 5,400 |

R. J. Nicoll Co. made certain payments representing both the employer's and the employees' share of the Federal social security tax for the taxable year April 1, 1965, to December 31, 1965, and for the taxable years 1966 and 1967. The total amounts so paid were deducted on the corporate income tax returns as payroll taxes in the amounts of $684 for 1965, $600 for 1966, and $414 for 1967. R. J. Nicoll Co. did not withhold from its employees' salaries their respective shares of the social security tax.

In his statutory notice of deficiency to the corporation, respondent allowed as a deduction to the corporation a portion of the social security taxes paid for each year as follows:

| Year | Amount paid | Amount allowed | Amount disallowed |
|---|---|---|---|
| Apr. 1, 1965, to Dec. 31, 1965 | $684 | $218 | $466 |
| 1966 | 600 | 353 | 247 |
| 1967 | 414 | 370 | 44 |

Respondent computed the disallowance of a portion of social security taxes as follows:

| | Apr. 1, 1965 to Dec. 31, 1965 | 1966 | 1967 |
|---|---|---|---|
| Wage limitation: | | | |
|   Raymond | $4,800 | $6,600 | $6,600 |
|   Barbara | 1,200 | 1,800 | 1,800 |
| Total compensation subject to social security tax | 6,000 | 8,400 | 8,400 |
| Rate percentage | 3.625 | 4.2 | 4.4 |
| Total allowable employer's share of social security tax: | | | |
|   (3.625 percent×$6,000) | $218 | | |
|   (4.2 percent×$8,400) | | $353 | |
|   (4.4 percent×$8,400) | | | $370 |
| Social security tax deduction claimed | 684 | 600 | 414 |
| Disallowed | 466 | 247 | 44 |

By amended petition, petitioners Raymond and Genevieve allege that on their joint Federal income tax return for the taxable year 1965, they overreported taxable gross income by the amount of $3,000.

For the taxable year 1965, Raymond reported on his income tax return, among other items, the following income:

| | Wages | Bonus | Total |
|---|---|---|---|
| $12,000 | | $2,500 | $14,500 |

For the taxable year April 1, 1965, to December 31, 1965, the corporation deducted wage compensation payments to Raymond in the amount of $9,000 (which, when added to the $2,500 bonus, resulted in $11,500 total compensation paid to Raymond). The accounting firm which prepared the 1965 corporate and individual Federal income tax returns for the petitioners erroneously reported on Raymond's W–2 form and income tax return $12,000 as wages received by Raymond from the corporation rather than the correct amount of $9,000 which was actually paid by the corporation as wages. Petitioner concedes that he also received a bonus of $2,500 from the corporation that year, which respondent does not dispute.

It was initially understood when R. J. Nicoll Co. was organized that Raymond's salary would continue to be $1,000 per month; prior to that time Raymond and Willard had each been paid a salary of $1,000 per month by Nicoll, Inc., which had apparently never been questioned by the Internal Revenue Service as unreasonable. In January of 1966 the directors of R. J. Nicoll Co. fixed Raymond's salary at $1,000 per month for 1966 and again the following January at the same rate for 1967. The salary for each year in question was not fixed with the view of absorbing all of the corporation's profits but was instead set to compensate Raymond for services currently being rendered to the corporation and for extraordinary services rendered in prior years when inadequate compensation was in fact paid.

### ULTIMATE FINDINGS OF FACT

Salaries paid to, and payments of employees' social security for the benefit of, Raymond were fair and reasonable as compensation for current and past services as follows: For the taxable year April 1, 1965, to December 31, 1965, $11,500 plus $174 paid by the corporation as Raymond's share of his social security taxes for that year; for the taxable year 1966, $11,500 plus the amount paid by the corporation as Raymond's share of his social security taxes for that year; for the taxable year 1967, $11,500 plus the amount paid by the corporation as Raymond's share of his social security taxes for that year.

Reasonable compensation paid by the corporation to, or for the benefit of, Barbara for services rendered by her to the corporation during the taxable year April 1, 1965, to December 31, 1965, and the taxable years 1966 and 1967 included: For the taxable year April 1, 1965, to December 31, 1965, $44 paid by the corporation as Barbara's share of her social security taxes for that year; for the taxable years 1966 and 1967, the amounts paid by the corporation as Barbara's share of her social security taxes for those respective years.

The amount of Raymond's share of his social security taxes for 1966 and 1967 and of Barbara's share of her social security taxes for those years will be computed under Rule 50, and Raymond's share shall be included in his income for 1965, 1966, and 1967 in computing the deficiency or overpayment for each year. Barbara is not before us in these cases.

Raymond overreported his gross income for the taxable year 1965 by the amount of $3,000.

OPINION

At the outset, the parties have made certain concessions on brief and reply brief which should be clarified. Certain medical expenses were paid by the corporation on behalf of Raymond in the amounts of $421 for the year 1966 and $1,262 for the year 1967, respondent claiming these amounts to be nondeductible dividends paid by the corporation for Raymond and taxable to him as such, and petitioners contending these payments to be deductible by the corporation and nontaxable to Raymond. Petitioners have conceded taxability to the extent of $45 for 1966 and $72 for 1967 and respondent has conceded this issue to the extent of $376 and $1,190 for those respective years.

There are three issues remaining for our decision. The first issue involves the reasonableness of compensation paid by R. J. Nicoll Co. to Raymond in the years 1965, 1966, and 1967. The second issue involves the deductibility by the corporation of amounts paid by the corporation in 1965, 1966, and 1967 as the employees' share of social security taxes for those respective years, such taxes having not been withheld from the employees' salaries. The third issue involves whether or not Raymond overreported his gross income for the year 1965 by the amount of $3,000. We deal with these remaining issues in reverse order.

R. J. Nicoll Co. was organized on April 1, 1965. Commencing at that time, it paid to Raymond a monthly salary wage of $1,000. As of December 31, 1965, the corporation had paid Raymond a total of $9,000 as wages, $1,000 per month for the months April through December, inclusive. This amount of $9,000 was deducted by the corporation on its Federal income tax return for the taxable year April 1, 1965, to

December 31, 1965, as wages paid to Raymond. A bonus of $2,500 was also paid by the corporation to Raymond, but this amount is not at issue, except insofar as respondent has disallowed $6,610 of the total of $11,500 claimed by the corporation as compensation paid to Raymond.

The same accounting firm prepared both the corporation's income tax return and Raymond's income tax return for 1965. Notwithstanding that the accounting firm reported a deduction of $9,000 as wages paid to Raymond in 1965 by the corporation on its income tax return, the accounting firm had previously erroneously prepared Raymond's W-2 form reflecting that wages received by him from R. J. Nicoll Co. for 1965 were in the amount of $12,000. This amount of $12,000 was then erroneously reported on Raymond's income tax return for 1965 as wages. This was occasioned by the fact that the accountants understood that Raymond's salary was $1,000 per month but they neglected to compute the annual total on a 9-month basis only for the short year, April 1, 1965, to December 31, 1965.

Based on all of the evidence presented, we conclude that Raymond did not receive $12,000 as wages from R. J. Nicoll Co. in 1965, but rather received only $9,000, $1,000 a month for the 9 months of the taxable year. Therefore, Raymond overstated his gross income for the taxable year 1965 by the amount of $3,000 and we have so found.

The next issue for our decision relates to the deductibility by R. J. Nicoll Co. of amounts paid by it as the employees' share of social security taxes. In general, an employer is allowed to deduct amounts paid as its share of social security taxes relative to its employees. However, as the social security tax is an excise tax, it is not deductible as a tax under section 164.[2] Rather, the deduction is allowed under section 162 as an ordinary and necessary business expense.

As set forth in our Findings of Fact, respondent computed, for the years involved, the amounts paid as social security tax by the corporation attributable to the employer's share based on the wages paid to the respective employees (subject to the appropriate limitations) and allowed these amounts as proper deductions. However, the excess amounts paid by the corporation, allegedly attributable to the employees' share of the social security tax, were disallowed.

Where an employer pays the employees' share of social security taxes, without withholding such tax from the employees' wages, such amounts so paid may be deductible. I.T. 3154, 1938-1 C.B. 113; see also I.T. 3382, 1940-1 C.B. 12. However, as the employees' share of the tax is not a tax imposed upon the employer, the payment of such taxes by the employer is not deductible as a business expense per se.

---

[2] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

In such cases, the employer may, however, deduct such amounts paid if those amounts constitute additional compensation to the respective employees in the nature of a constructive receipt based on the discharge, by the employer's payment, of the employees' social security tax obligation. See generally *Old Colony Tr. Co.* v. *Commissioner*, 279 U.S. 716 (1929). The amounts so paid are then deductible as compensation within the constraints of section 162(a)(1) and section 1.162–7, Income Tax Regs. I.T. 3154 and I.T. 3382, *supra.*

It follows, therefore, that in order for the corporation to sustain its deduction for the amounts so paid by it as the employees' share of the social security tax, those amounts so paid must be found to constitute reasonable compensation to the respective employees to the extent that the corporate payment discharges their respective obligations under the social security tax.

With respect to the year 1965, an amount of $466 was disallowed as an amount paid in excess of the amounts due as the employer's share of the social security tax. The corporation must therefore show that this entire excess amount of $466 represented additional reasonable compensation to its employees by discharging their respective obligations under the social security tax. However, we note by reference to the computation by respondent in our Findings of Fact that based on the wages paid (subject to the appropriate limitations), the employees' share of social security taxes due for 1965 would be $174 for Raymond and $44 for Barbara. Hence, the maximum amount which the corporation could claim as compensation pursuant to discharge of the employees' obligations would be $218.

Accordingly, of the $466 payment in excess of the employer's share, the corporation could claim only a maximum of $218 as compensation as a deduction based on I.T. 3154 and I.T. 3382, *supra.* Our issue at this point, then, is whether the amount of $174 and the amount of $44 constituted additional reasonable compensation for Raymond and Barbara, respectively, for the year 1965.

The years 1966 and 1967 present a slightly different problem. In each of those years, the amounts disallowed by respondent as amounts paid in excess of the employer's share of the social security tax were less than the obligations of the employees for their share of the social security tax as reference to respondent's computations noted in our Findings of Fact indicates. In 1966, the excess payment by the corporation was $247 while the employees' computed share of the social security tax would be $353 ($277 for Raymond and $76 for Barbara).

The facts disclose no indication as to the allocation of this $247 amount with respect to Raymond's $277 computed obligation and Barbara's $76 computed obligation. However, as long as the $247 can be

established in total as reasonable compensation, no matter how allocated between the employees, the corporation will be permitted to take the deduction.

With regard to Raymond, who is before us as a petitioner, to the extent that his social security tax obligation was discharged by the corporation's payment thereof, his gross income should be correspondingly increased. *Old Colony Tr. Co.* v. *Commissioner, supra.* An allocation of the corporate payments between Raymond and Barbara will be necessary under the Rule 50 computation. As Barbara is not a party to this action, we cannot determine a deficiency as to her. In any event, since we conclude that the total amount paid is reasonable compensation under any particular allocation, between or to either employee, of the $247, the corporate petitioner is entitled to the deduction.

The year 1967 involves the same problem as 1966, in that for 1967 the excess amount paid by the corporation over its share of the social security tax was $44, an amount less than the employees' combined computed obligations thereunder in the amount of $370 ($291 for Raymond and $79 for Barbara). For the reasons set forth above, no particular allocation of the $44 is necessary for the corporate petitioner to be entitled to the deduction as long as the total amount is reasonable compensation under any allocation. Again, however, an allocation will be required under Rule 50 computation with respect to Raymond's increase in gross income for the amount of his proportionate share.

As the deduction by the corporation for those amounts paid as the employees' share of social security taxes depends on a determination of such amounts being considered additional reasonable compensation, this issue now merges into our third issue of reasonable compensation and is decided thereunder.

It is petitioner corporation's position that the wages and bonus payments made to Raymond during the taxable year April 1, 1965, to December 31, 1965, and during the taxable years 1966 and 1967, in the amounts of $11,500, $15,000, and $11,500, respectively, were reasonable compensation adequately justified by services rendered during the respective years in which those payments were made. Alternatively, or supplementally, petitioner corporation contends that the payments were not unreasonable in light of services performed by Raymond for the corporation's predecessors in prior years for which services Raymond was undercompensated in those years.

Respondent contends that the services rendered by Raymond during the years at issue were not sufficient to justify the wages and bonus payments made to Raymond during those years. However, respondent allowed as deductible the amounts of $4,890 for 1965, $6,200 for 1966, and $6,100 for for 1967 based on a formula incorporating percentage

fees to yield an asserted reasonable compensation. Further, respondent contends that the facts do not justify petitioner's claim of past service compensation in order to obtain the entire deduction. Therefore, respondent has treated the excess compensation so determined, in the amounts of $6,610 for 1965, $8,800 for 1966, and $5,400 for 1967, which amounts were paid to Raymond, as dividend income to Raymond and not deductible by the corporation.

Section 162(a)(1) provides for a deduction of a reasonable allowance for salaries or other compensation for personal services actually rendered as an ordinary and necessary expense paid or incurred during the taxable year in carrying on any trade or business. The determination of reasonableness of such compensation is one of fact to be determined by all of the circumstances of each case. *Cooke* v. *Commissioner*, 203 F.2d 258 (C.A. 10, 1953), certiorari denied 346 U.S. 815 (1953); *Miller Mfg. Co.* v. *Commissioner*, 149 F.2d 421 (C.A. 4, 1945); *S. & B. Realty Co.*, 54 T.C. 863 (1970); *Boyle Fuel Co.*, 53 T.C. 162 (1969); *Geiger & Peters, Inc.*, 27 T.C. 911 (1957). The burden of proving reasonableness of such compensation is on the taxpayer. *Botany Worsted Mills v. United States*, 278 U.S. 282 (1929).

Raymond's services rendered to the corporation during the years in issue in managing the service station properties and rentals do not justify a finding of compensatory reasonableness to the extent contended by petitioner. Although testimony on the point was conflicting, we do not think that Raymond was, to any significant degree, involved in providing advice or assistance to the operators of the service stations concerning particular business practices. It is true that Raymond had acquired an extensive amount of experience in the field; however, it does not appear that he did anything more than visit the service stations occasionally and chat with whoever was there. Aside from very general statements by Raymond, there is no specific evidence that Raymond ever provided any specific business advice to the operators of the service stations nor any evidence of any formal or informal arrangements that Raymond might have established to provide such advice. Indeed, there is specific testimony to the contrary.

The repair and maintenance work that was done at the service stations was not unique or extensive. It included the normal types of maintenance and repairs involving plumbing, heating, windows, roofing, driveways, curbs, and the like. Even with respect to these repairs and maintenance, it was not Raymond himself who would actually perform the repair work. Rather, Raymond would contract for other persons (plumbers, electricians, etc.) to actually go to the stations and make the necessary repairs.

The record indicates that the leases on the stations were generally for terms ranging from 5 to 10 years in duration. There was no prob-

lem with respect to the collection of the rental income. There is no evidence that Raymond spent any substantial time in obtaining new tenants, as he was not dealing with a high rate of occupant turnover.

With respect to the administrative side of the corporation's business, the evidence indicates that Raymond's wife did practically all of the recordkeeping of the corporation. She usually wrote the checks and made the deposits, and handled the business phone calls. Raymond's daughter handled the remaining secretarial functions and "ran errands" for Raymond as needed in the business. As Raymond himself performed little, if any of these administrative tasks, we cannot attribute any significant portion of his compensation thereto for the years in issue.

Notwithstanding the minimal level of Raymond's advisory services, notwithstanding the generally passive nature of Raymond's involvement with the repairs and maintenance, notwithstanding the absence of any problems with respect to collecting rents or obtaining tenants, and notwithstanding the lack of any significant administrative functions performed by Raymond, petitioner offered opinion testimony to the effect that reasonable compensation for the services rendered by Raymond to the corporation during the years at issue would be in the $12,000 to $15,000 per year range.

Petitioner argues that the credibility of the witnesses was not questioned and that respondent offered no witnesses to contradict this testimony or to testify that the compensation was unreasonable to any extent. Thus, petitioner continues, we should be bound to accept this testimony as a fact, citing *Robert Louis Stevenson Apartments, Inc.* v. *Commissioner*, 337 F.2d 681 (C. A. 8, 1964), reversing a Memorandum Opinion of this Court, and *Roth Office Equipment Co.* v. *Gallagher*, 172 F.2d 452 (C. A. 6, 1949).

We reject petitioner's contention for the reason that specific language in the *Roth* case itself circumscribes a limitation on the theory which petitioner seeks here to invoke, and we think that the limitation so indicated applies to this case.

In *Roth* it was stated that:

The burden of proof in cases of this kind is upon the taxpayer, but we are of the opinion that that burden has been met when the taxpayer introduces uncontradicted, unimpeached testimony from well-qualified, impartial witnesses sustaining its contention, *unless the established facts themselves are such as to show that such testimony ought not to be accepted.* * * * [Emphasis added. 172 F. 2d at 456.]

We note that one of the witnesses on this point was Raymond's brother, Willard, and we query the complete impartiality of his testimony, such impartiality being an express requirement of the *Roth* case. We further note that the other witness on this point expressly based

his opinion as to the reasonableness of compensation on the testimony which he had heard at trial relevant to the extent of services performed by Raymond during the years in issue. As we have rejected much of this testimony upon which this opinion was rendered, the opinion itself loses its significance.

For these same reasons, *Robert Louis Stevenson Apartments, Inc.* v. *Commissioner, supra*, is also distinguishable.

In the Tenth Circuit the rule that controlling, positive, and uncontradicted evidence may not be disregarded is subject to a qualification requiring that the evidence is not inherently improper, and no circumstances reflected on the record casts doubt on its verity. *Perlmutter* v. *Commissioner*, 373 F. 2d 45 (C.A. 10, 1967), affirming 44 T.C. 382 (1965), and cases cited therein at footnote 7 at 48. See also *Golden Construction Co.* v. *Commissioner*, 228 F. 2d 637 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court.

Thus we have properly rejected the opinion testimony of petitioner's witnesses with respect to the value of services performed by Raymond during the years in issue as not meeting the requisite standards as required by the cases. *Roth Office Equipment Co.* v. *Gallagher, supra; Robert Louis Stevenson Apartments, Inc.* v. *Commissioner, supra; Perlmutter* v. *Commissioner, supra; Golden Construction Co.* v. *Commissioner, supra.*

We think that the petitioner in this case has not established a sufficient basis of facts to support the deductions in the full amounts contended for by petitioner as compensation for services rendered in the years in issue. We note that the circumstances of petitioner's case fall substantially short of those in *S. & B. Realty Co., supra*, with respect to services performed in 1965, 1966, and 1967.

However, a deduction for reasonable compensation is not limited to amounts paid as compensation for services rendered in current years. Payments made by an employer to an employee may be deductible as reasonable compensation for current and past services rendered. *Lucas* v. *Ox Fibre Brush Co.*, 281 U.S. 115 (1930); *John C. Nordt Co.*, 46 T.C. 431 (1966), acq. as to this issue 1972–2 C.B. 2; *General Smelting Co.*, 4 T.C. 313 (1944).[3]

The prior services performed by Raymond for the corporate employer's predecessors (Nicoll Brothers Oil Co. and Nicoll, Inc.—predecessors of Raymond's one-half interest now conducted as R. J. Nicoll Co.) is adequately established by the record, and we have found that Raymond's salaries in the early years were substantially less than

---

[3] See also *Mahaska Bottling Co.*, T.C. Memo. 1962–289; *Carl B. Carter*, T.C. Memo. 1958–166, affirmed in part, modified in part, and remanded on another issue 276 F.2d 476 (C.A. 5, 1960); *Perel and Lowenstein, Inc.*, T. C. Memo. 1955–115, affd. 237 F.2d 908 (C.A. 6, 1956).

the value of his services then rendered; he was being paid from $9,000 to $12,000 per year but his services were reasonably worth from $15,000 to $18,000.

Although the prior services were rendered to the predecessor corporations, it is obvious that R. J. Nicoll Co. was a direct beneficiary of these prior undercompensated efforts by Raymond. R. J. Nicoll Co. was merely a "split-up" continuation of the business theretofore conducted as a joint effort between Raymond and Willard in the form of Nicoll Brothers Oil Co. and Nicoll, Inc., and Raymond's employee-employer relationship with R. J. Nicoll Co. was merely a carryover of the business which he had built up for the corporations for over 30 years.[4] R. J. Nicoll Co. commenced business operations with its share of the earned surplus of the predecessor corporation, $70,603, which was generated, at least in part by Raymond's past services, for which he was inadequately compensated.

The compensation in the early years ranged between $9,000 per year to $12,000 per year, and we have found from the evidence that such services were worth between $15,000 and $18,000 per year.[5] The reason for such undercompensation was the necessity of keeping the funds in the corporation for the continued growth and success of the business.

During the early years of the business, the company had borrowed large sums of money to finance construction projects, and Raymond and Willard undertook the risk of personal liability on the notes. In those years, they worked long hours, 6 and 7 days a week. It is clear that they were solely responsible for the continued development and success of the business in not only the construction of 150 to 200 service stations, but also in maintaining the distributorships until 1952.

---

[4] Respondent makes no contention that R. J. Nicoll Co. is not entitled to the deductions on the grounds that Raymond's services were rendered to the predecessor corporation rather than to R. J. Nicoll Co. itself. Cf. *Daily Journal Co.* v. *Commissioner*, 135 F.2d 687 (C.A. 9, 1943), wherein a taxpayer-corporation was allowed a deduction for salary paid to its president although his services consisted largely of managing another corporation which the taxpayer-corporation had formed with several other corporations to carry on their businesses in a consolidated fashion. The court found that the taxpayer-corporation was in essence providing managerial services to the consolidated corporation, and as it was thus in the management business it could deduct the cost of providing that service, notwithstanding that the services of the president were primarily to the consolidated corporation and the taxpayer-corporation's only benefit from these services was in the nature of its increased income from its share of ownership of the consolidated business. In our case, although Raymond did not render his prior services directly to the precise legal entity of R. J. Nicoll Co., as employer, we think that R. J. Nicoll Co. was undeniably the residual beneficiary of Raymond's prior undercompensated services. Just as in *Daily Journal Co.*, Raymond did not render his services, in those prior years, directly to R. J. Nicoll Co.; also just as in *Daily Journal Co.*, R. J. Nicoll Co. was benefited by those services, although in a successor rather than a contemporaneous capacity.

[5] Petitioners' uncontradicted opinion evidence as to the value of Raymond's services to the corporation in earlier years was based upon facts which we have found established by the record before us; it is not inherently improper nor lacking in trustworthiness or verity and we therefore do not reject it.

We think that the facts of this case are clearly sufficient to establish that the amounts paid to, or for the benefit of, Raymond in the years before us included reasonable compensation paid in the years in issue for current services and for services rendered by Raymond in prior years to the corporate employer's predecessors, and we have so found. *Lucas* v. *Ox Fibre Brush Co.*, *supra; John C. Nordt Co.*, *supra.*

Petitioner's situation is quite distinguishable from the facts in *Perlmutter* v. *Commissioner*, *supra*, and *Brandtjen & Kluge, Inc.*, 34 T.C. 416 (1960), on which respondent relies, and we do not view either of these cases as persuasive authority here.

In this case, although not formally expressed in the nature of a corporate resolution, there is specific testimony, based upon facts which we have found, that Raymond was undercompensated in the early years so that the corporation could retain the needed cash, and that the brothers expected to reap the compensatory benefits for these undercompensated services in later years.

Accordingly, based on all of the above, we have found that reasonable compensation paid to, or for the benefit of, Raymond in the taxable year April 1, 1965, to December 31, 1965, and the taxable years 1966 and 1967, for services rendered by Raymond to the corporation in those years and to the corporation's predecessors during prior years, for which Raymond was undercompensated was: For the taxable year April 1, 1965, to December 31, 1965, $11,500 plus $174 paid by the corporation as Raymond's share of his social security taxes for that year; for the taxable year 1966, $11,500 plus the amount paid by the corporation as Raymond's share of his social security taxes for that year; for the taxable year 1967, $11,500 plus the amount paid by the corporation as Raymond's share of his social security taxes for that year. Therefore, petitioner corporation properly deducted those amounts in the respective years involved. They were ordinary and necessary business expenses of the corporate taxpayer in the years in which paid. *John C. Nordt Co.*, *supra.* To the extent that the amounts paid exceeded the amounts found to be reasonable, they may not be deducted by the corporation and are taxable to the individuals as determined by respondent.

With respect to the balance of the deductions claimed by the corporation attributable to the employer's payment of Barbara's share of her social security taxes, we think based on her services to the corporation, such payments were reasonable compensation in addition to the salary which was paid directly to her. Accordingly, we have found that reasonable compensation paid by the corporation to, or for the benefit of, Barbara for services rendered by her to the corporation during the taxable year April 1, 1965, to December 31, 1965, and the

taxable years 1966 and 1967 included: For the taxable year April 1, 1965, to December 31, 1965, $44 paid by the corporation as Barbara's share of her social security taxes for that year; for the taxable years 1966 and 1967, the amounts paid by the corporation as Barbara's share of her social security taxes for those respective years. Therefore, petitioner corporation was entitled to deduct those amounts in the respective years involved.

*Decisions will be entered under Rule 50.*