EDUARDO CATALANO, INC., PENSION TRUST, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Eduardo Catalano, Inc. v. Commissioner
Docket Nos. 6173-76, 149-77 and 150-77.
United States Tax Court
T.C. Memo 1979-183; 1979 Tax Ct. Memo LEXIS 346; 38 T.C.M. (CCH) 763; T.C.M. (RIA) 79183; May 9, 1979, Filed *346 Held, no part of the distributions made by the corporate petitioner to or on behalf of its sole shareholder represented a payment of dividends. Gordon H. Wentworth and Frederick D. Royal, for the petitioners. David N. Brodsky, for the respondent. STERRETT *347 MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on June 28, 1976, issued a statutory notice to petitioner Eduardo Catalano, Inc., Pension Trust for its taxable years ended June 30, 1972 and June 30, 1973 in the amount of $1,338 and $5,918, respectively. On November 23, 1976 respondent issued a statutory notice to petitioner Eduardo Catalano for his taxable year ended December 31, 1972 in the amount of $5,826. On the same date respondent issued a statutory notice to petitioner Eduardo Catalano, Inc. for its taxable years ended June 30, 1972 and June 30, 1973 in the amounts of $32,400 and $63,197, respectively. These cases were consolidated for the purpose of trial, briefing and opinion. After concessions by respondent the sole issue for our determination is whether a part of the distributions made by petitioner Educardo Catalano, Inc. during its fiscal years ended June 30, 1972 or June 30, 1973 to or on behalf of its sole shareholder, petitioner Educardo Catalano, represented a payment of dividends. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated *348 herein by this reference. Eduardo Catalano is an individual who resided in Cambridge, Massachusetts at the time of filing his petition herein. His Federal income tax returns for the calendar years 1972 and 1973 were prepared and timely filed on the cash receipts and disbursements method of accounting with the District Director of Internal Revenue, Andover, Massachusetts. Mr. Catalano is a professional architect and professor of architecture. He has conducted a professional practice as an architect individually, as a partner in a number of joint ventures and as an employee of Eduardo Catalano, Inc. for a number of years. He was a professor of architecture at the Massachusetts Institute of Technology from 1956 until he retired therefrom in June of 1977. He taught one class during the school year that ended in June of 1972. During the school year that commenced in September of 1972 and ended in June of 1973 he was on leave of absence from his duties as a professor. Mr. Catalano has been acclaimed as one of the world's leading architects in numerous professional and general publications including Time Magazine, Life, Fortune, New York Times and more than 30 foreign publications. *349 He is the author of the following books on architecture: Treatise on Shades, Shadows and Perspective,Structure of Warped Surfaces, Estructuras de Superficies Alabedas, 2nd reprint, and Eduardo Catalano -- Buildings and Projects. He has designed numerous projects and buildings, including: a. The Julliard School of Music at the Lincoln Center for Performing Arts in New York City; b. The Student Center at the Massachusetts Institute of Technology; c. The United States Embassy in Buenos Aires, Argentina; d. A house in Raleigh, North Carolina that has been acclaimed as the "House of the Decade"; e. Hampden County Hall of Justice in Springfield, Massachusetts; f. Governmental Center in Greensboro, North Carolina; g. Baystate West Complex in Springfield, Massachusetts; and h. LaGuardia High School for the Performing Arts in New York City. Eduardo Catalano Inc. (hereinafter ECI) was a Massachusetts corporation with its principal office located in Cambridge, Massachusetts at the time of filing its petition herein. The corporate Federal income tax returns for its fiscal years ended June 30, 1972 and June 30, 1973 were timely filed with the District Director *350 of Internal Revenue, Andover, Massachusetts. ECI was formed on November 27, 1968 by Mr. Catalano as a professional architectural service corporation. He formed ECI in order to limit his personal liability with respect to his architectural projects. He also considered the pension benefits available to the corporate form. During the years in issue Mr. Catalano was the sole shareholder and only employee of ECI. At all times since the formation of ECI Mr. Catalano has been solely responsible for obtaining all architectural commissions and contracts for the corporation. As the sole employee he has also controlled and been responsible for the completion of all architectural projects from initial architectural design through completion of construction. The fees and gross receipts paid to ECI represented payment for architectural services rendered by Mr. Catalano. The corporate returns are calculated on the cash basis method of accounting. The following schedule shows the gross receipts, professional fees, claimed compensation payments and net income of ECI for its fiscal years ended June 30, 1969 through June 30, 1973, inclusive: 1969 *
1970
1971
1972
1973
Gross receipts from
$199,175
$364,171
$324,040
$680,201
$717,663
architectural services
Fees paid others inclu-
57,308
219,746
185,764
502,673
489,708
ding General Design
Corp. for professional
services
Direct compensation to
75,000
75,000
75,000
100,000
151,600
Eduardo Catalano
Deferred compensation for
37,500
37,500
37,500
50,000
75,800
Eduardo Catalano
Net income of ECI before
27,350
24,800
17,601
19,414
525
tax
*351 The decision to increase Mr. Catalano's salary for ECI's fiscal year ended June 30, 1972 was made at a special meeting of the board of directors held July 1, 1971. The decision to increase his salary for the fiscal year ended June 30, 1973 was made at the annual board of directors meeting held September 30, 1972. These decisions were based on the amount of work done by Mr. Catalano with respect to the anticipated income of the corporation. The fees received for architectural services are normally based upon a standard American Institute of Architects architectural contract. Therein payments for basic services are made to the architect in accordance with the following schedule: (1) An initial minimum payment stipulated by the contract (2) Subsequent payments made monthly in proportion to services performed so that the compensation at the completion of each phase is equal to the following percentages of the total compensation: Schematic design phase
15%
Design development phase
35%
Construction documents phase
75%
Bidding or negotiation phase
80%
Construction phase
100%
Thus, performance of services and the payment therefor *352 need not take place within the same fiscal year. ECI was incorporated with capital of $1,000. During its fiscal years ended June 30, 1969 through June 30, 1971 $48,810 in earnings after corporate tax were retained and added to surplus. An additional $14,781 and $2,125 were retained for the fiscal years ended June 30, 1972 and June 30, 1973, respectively, bringing retained earnings to $65,717. ECI paid no dividends during its fiscal years 1969 through 1973. General Design Corporation (hereinafter GDC) was a Massachusetts business corporation established April 3, 1963. Its principal office was shared with that of ECI.Mr. Catalano was its sole shareholder. It was a cash basis taxpayer which kept its books and reported its income on a fiscal year ending March 31. GDC performed services for ECI, for various architectural partnerships and for Mr. Catalano during the period commencing with its organization and ending with its fiscal year ended March 31, 1974. During this period GDC paid no dividends. During the fiscal year ended March 31, 1972 GDC employed the following individuals: [SEE TABLE IN ORIGINAL] Prior to the creation of ECI Mr. Catalano rendered architectural *353 services as a sole proprietor. His gross receipts for the calendar year 1968 were $772,047 and his net profit for that year was $144,766. The consumer price indexes by major groups compiled by the Department of Labor Bureau of Labor Statistics reflects the following increases for the years 1968 through 1973 for all services: Year
All Services
Percentage Increases
1968
105.2
1969
112.5
7.3
1970
121.6
9.1
1971
128.4
6.8
1972
133.3
4.9
1973
139.1
5.8
For its fiscal years ended June 30, 1972 and 1973 ECI made payments to Mr. Catalano which it deducted as salary payments in the sum of $100,000 and $151,600, respectively. For those years it also made contributions to the Eduardo Catalano, Inc. Pension Trust on behalf of Mr. Catalano in the amounts of $50,000 and $75,800, respectively. The salary payments from ECI shown on Mr. Catalano's returns totaled $150,000 and $101,600 for his calendar years 1972 and 1973, respectively. Respondent concedes that $132,500 of the $150,000 of direct and deferred compensation payments made to or on behalf of Mr. Catalano by ECI during its fiscal year ended June 30, 1972 constitutes payments for services actually *354 rendered which were reasonable in amount. He concedes that $166,550 of the $227,400 of direct and deferred compensation payments made to or on behalf of Mr. Catalano during its fiscal year ended June 30, 1973 constitutes payment for services actually rendered which were reasonable in amount. He contends that the difference represents a payment of dividends. OPINION Section 162(a)(1), I.R.C. 1954, allows a business to deduct reasonable amounts as compensation for services rendered. [2] Thus, the dual criteria for deductibility are that the payment was reasonable in amount and compensatory in character. Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958), cert. den. 359 U.S. 966 (1959). *355 Whether amounts paid as compensation are reasonable is a question of fact and the burden of proof is on the taxpayer. R.J. Nicoll Co. v. Commissioner,59 T.C. 37, 48 (1972). The challenged payment is subject to rigorous scrutiny when it is paid to the sole shareholder of the corporation. Kerrigan Iron Works, Inc. v. Commissioner,17 T.C. 566, 572 (1951). Factors that have been considered in determining reasonability are: (1) the shareholder/employee's qualifications, (2) the work performed, (3) prevailing salaries for comparable work, (4) prior earning capacity as a self-employed in individual, (5) prior years' compensation by the corporation, (6) the size of the business and its complexity, and (7) general economic conditions. Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 121 (6th Cir. 1949), Miles-Conley Co. v. Commissioner,173 F.2d 958, 960 (4th Cir. 1949). Mr. Catalano is a renowned architect. As the sole employee of ECI he is the fount of that company's income. In light of the fact that ECI had adequate sources from which it could pay Mr. Catalano without threatening its own financial status, it *356 is difficult to support a finding that such payments were unreasonable in amount. ECI makes a convoluted argument with respect to the reasonability of the amount paid as compensation. It points out that under section 1348 [3] an individual taxpayer's personal service income may not be taxed at a rate in excess of 50 percent. It reasons that, because Catalano was the sole employee of ECI, income of ECI should be considered earned income as defined by section 911(b) [4] and, therefore, section 1348 should prescribe the maximum tax impact on the individual. Consideration of this argument is unnecessary due to the result reached herein. *357 It is less clear whether amounts paid Mr. Catalano in the years in issue were compensatory in character. Factors which have been considered with respect to a payment's character are: (1) the corporation's history of dividend payment, (2) the availability of funds for distribution, (3) a comparison of gross and net income of the corporation in relation to the compensatory amount, and (4) the method used to compute compensation. Miles-Conley Co. v. Commissioner,supra;Mayson Mfg. Co. v. Commissioner,supra;Klamath Medical Service Bureau v. Commissioner,supra.
Herein, ECI has paid no dividends. Although the record suggests that the retained earnings were not available for distribution, we find this factor inconclusive because a further finding that the amount paid Mr. Catalano was excessive or was paid as a dividend rather than as compensation would result in a corresponding source of funds from which a dividend distribution could have been made. The amount paid Mr. Catalano was 88.5 ($150,000 of $169,414) and 99.8 ($227,400 *358 of $227,925) percent of ECI's pre-salary net earnings for its fiscal years ended June 30, 1972 and June 30, 1973, respectively. However, when the amount paid is compared to ECI's gross income ($150,000 of $680,201 or 22.05 percent in 1972 and $227,400 of $717,663 or 31.69 percent in 1973), it is actually less than the average of the ratio of compensation to gross income for the two prior full years ($112,500 of $364,171 or 30.9 percent in 1970 and $112,500 of $324,040 or 22.05 percent in 1971). [5]
Another indication of the character of the payment is the corporation's method of computing Mr. Catalano's compensation. The salary increases were based on the amount of work done by Mr. Catalano with respect to the anticipated earnings of the corporation. Because payments to ECI were spread over the period during which the services were performed as indicated by the payment schedule referred to in our findings of fact, the corporation, and Mr. Catalano, could *359 reasonably anticipate ECI's earnings prior to the close of its fiscal year. However, the decision to increase Mr. Catalano's salary for ECI's fiscal year ended June 30, 1972 was made at a special board of directors meeting held July 1, 1971. The decision to increase his salary for the fiscal year ended June 30, 1973 was made at the annual board of directors meeting held September 30, 1972. Admittedly we are somewhat disturbed by ECI's historical failure to make a dividend distribution. If its stock were owned by an unrelated third party who had advanced capital, there would naturally come a time when that party would become restless over ECI's failure to make a return on his investment. ECI's first fiscal year ended in 1969. We are not prepared to say that it had reached that point with respect to its taxable years 1972 and 1973. Therefore, based on all the facts and circumstances, we find that ECI properly characterized its payments to Mr. Catalano as compensation. Decisions will be entered for the Petitioners.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Eduardo Catalano, docket No. 149-77, and Eduardo Catalano, Inc., docket No. 150-77.↩
*. Short fiscal years.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered.↩
3. SEC. 1348. 50-PERCENT MAXIMUM RATE ON PERSONAL SERVICE INCOME. (a) General Rule. -- If for any taxable year an individual has personal service taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall * * * be the sum of -- (1) the tax imposed by section 1 on the highest amount of taxable income on which the rate of tax does not exceed 50 percent, (2) 50 percent of the amount by which has personal service taxable income exceeds the amount of taxable income specified in paragraph (1) of this subsection, and (3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his personal service taxable income. ↩
4. SEC. 911(b). Definition of Earned Income. -- For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.↩
5. Fiscal year 1969, the first year of corporate existence was a short year. The figures for that year reflect payment to Mr. Catalano of $112,500 and gross income for ECI of $199,175 resulting in a ratio of 56.48 percent.↩