T.C. Memo. 2001-197

UNITED STATES TAX COURT

DAMRON AUTO PARTS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5661-00.                          Filed July 30, 2001.

<u>Ronald J. Russo</u>, for petitioner.

<u>William R. McCants</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notice dated February 17, 2000, respondent determined deficiencies and section 6651(a)(1) additions to petitioner's Federal income taxes as follows:

| Year | Deficiency | Sec. 6651(a)(1) Addition |
|------|------------|--------------------------|
| 1993 | $269,956 | $63,464 |
| 1994 | 502,174 | 24,859 |
| 1995 | 482,736 | -- |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues are whether petitioner is entitled to section 162 deductions relating to compensation payments in excess of the amounts determined by respondent and whether petitioner is liable for section 6651(a)(1) additions to tax.

FINDINGS OF FACT

## I. <u>Background</u>

Petitioner was incorporated in 1982. It had its principal place of business in Florida when the petition was filed. From 1982 until 1992, Leonard A. Damron, III, and his sister, Sharon Owen, owned 51 and 49 percent, respectively, of petitioner's stock. Mr. Damron and Mrs. Owen's husband, Ronald, operated petitioner, which recycled and sold used auto parts. In 1984, petitioner's stock was worth approximately $200,000. On August 12, 1992, Mrs. Owen sold her stock in petitioner and related corporations to Mr. Damron for $250,000, and Mr. Owen entered into an employment contract with petitioner. On October 31, 1995, petitioner declared and paid a $7,589 dividend to Mr. Damron. In 1998, Mr. Damron sold, for $12,500,000, all of petitioner's stock to, and became an employee of, LKQ Corporation (LKQ), a national provider of recycled auto parts. Petitioner's gross receipts were as follows:

| Year | Amount |
|------|--------|
| 1993 | $9,108,625 |
| 1994 | 10,552,652 |
| 1995 | 11,355,749 |
| 1998 | 13,000,000 |

## II. Operations

Mr. Damron upgraded petitioner's business from a basic salvage yard to a modern state-of-the-art showroom.  Under his leadership, petitioner purchased wrecked cars from insurance companies and auctions, dismantled the cars, tested and cleaned the parts, indexed the parts in a computer data base, and shelved the parts for sale.  Thus, the parts could be sold to customers without employees' scavenging the salvage yard.

From 1984 through 1995, Mr. Damron typically worked 90 to 100 hours per week, did not go out for lunch, and took only three vacations of a few days each.  Mr. Damron attended the auctions, purchased wrecked cars, priced all the parts, determined when to crush dismantled vehicles, arranged the sale of crushed hulks, negotiated with vendors, reviewed accounts receivable and payable, and designed petitioner's facility.

During the years in issue, petitioner had 40 to 60 employees.  Mr. Damron interviewed, hired, evaluated, and terminated the employees; trained and supervised the dismantlers; and was responsible for employee benefits, health plans, bonuses, workers' compensation, insurance, employee safety, and hazardous waste disposal.

On October 24, 1994, Mr. Damron and his wife entered into a Marital Settlement Agreement which stated that petitioner's stock was worth $1,200,000. In 1995, Mr. Damron and his wife were divorced as a result, in part, of his grueling work schedule. In July 1996, Mr. Damron and his wife were remarried.

III.  Compensation

During 1985 through 1991, petitioner's accountant formulated compensation for Mr. Damron and Mr. Owen reflecting base salaries and bonuses. Mr. Damron's bonus was 10 percent of wholesale sales. Petitioner paid Mr. Damron only a portion of the compensation thus formulated, resulting in underpayments of $191,251, $278,963, $359,903, $430,370, $437,280, $587,340, and $364,332, relating to 1985 through 1991, respectively. Effective February 20, 1990, Mr. Damron, his wife, and Mr. and Mrs. Owen signed a Capital Accumulation Verification (Verification) forgiving any debts petitioner owed them.

During 1992 through 1995, petitioner's accountant formulated Mr. Damron's bonus as 10 percent of wholesale sales or, if less, 50 percent of any excess of petitioner's income (i.e., after wages) over $500,000, or 25 percent of any such excess over $250,000. Petitioner's payments to Mr. Damron and gross profits were as follows:

| Year | Salary | Bonus | Payment for Past Services | Total Compensation | Petitioner's Gross Profits |
|------|--------|-------|-----------|--------------|---------------|
| 1993 | $480,000 | $387,073 | $482,927 | $1,350,000 | $3,779,338 |
| 1994 | 961,500 | 520,648 | 354,966 | 1,837,114 | 4,693,741 |
| 1995 | 1,000,000 | 496,386 | 406,160 | 1,902,546 | 5,080,865 |

During the years in issue, Mr. Damron was not a participant in any pension, profit-sharing, or executive compensation plan.

In 1998, pursuant to his sale of petitioner's stock to LKQ, Mr. Damron became vice president (Southeast Region) of LKQ. In addition, he remained president of petitioner. Mr. Damron earned about $500,000 per year, which included base compensation of $250,000 per year and additional compensation dependent on revenue generated in the region. He also received incentive compensation based upon "corporate and regional financial and operating objectives". The Southeast Region generated about $90,000,000 annually. As an LKQ employee, Mr. Damron was entitled to 30 days of vacation every year.

IV. Other Corporations

During the years in issue, Mr. Damron was the sole shareholder of the following nine corporations: Damron Management Corporation; Damron Used Auto Parts Stores, Inc.; Yuppie Euro, Inc.; Damron Service, Inc.; Damron Land Holdings, Inc.; Damron Trucking, Inc.; Damron Parts Replacement Corp.; Damron Used Auto Parts of Gainesville, Inc.; and Damron Auto Parts of Georgia, Inc. He rendered 10 percent of his services to these corporations but did not receive salary from them.

## V. Returns

On July 15, 1994, and July 17, 1995, petitioner's respective 1993 and 1994 returns were due (i.e., after extensions).  On November 18, 1994, and August 2, 1995, respondent received the respective 1993 and 1994 returns.  Respondent determined that Mr. Damron's compensation should be adjusted as follows:

| Year | Amount Allowed | Adjustment |
|------|---------------|------------|
| 1993 | $468,946 | $881,054 |
| 1994 | 492,373 | 1,344,741 |
| 1995 | 517,004 | 1,385,532 |

OPINION

## I. Compensation

Section 162(a) allows a deduction for salary expense if the amount is reasonable and the expense relates to compensation for services actually rendered.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. T.C. Memo. 1980-282.  An expense "may be deductible as reasonable compensation for current and past services rendered."  R. J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50 (1972).

We note at the outset that 10 percent of the compensation paid, during the years in issue, to Mr. Damron, was directly attributable to services performed for the nine other corporations he controlled.  These amounts should have been paid by such corporations and, accordingly, are not deductible by

petitioner.  Thus, we must determine whether petitioner is entitled to deduct 90 percent of the compensation paid.

Citing petitioner's payment of only one dividend over 16 years, respondent contends that the disallowed payments were not reasonable compensation.  Dividend history, however, is only one of many factors in determining reasonableness of compensation. See Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).  During the years in issue, Mr. Damron performed several functions for petitioner in numerous roles (i.e., purchasing, selling, supervising, etc.).  He worked incessantly and exercised sound business judgment which had a direct and significant impact on petitioner's profitability.  Mr. Damron transformed petitioner's business from a basic salvage yard to a modern state-of-the-art showroom.  Petitioner's facility, according to respondent's expert, "is reported to be the largest of its kind."  In addition, our analysis of the return on equity in petitioner reveals that petitioner had a high rate of return despite its failure to pay dividends.  See Elliotts, Inc. v. Commissioner, supra at 1244 (rejecting the automatic dividend rule).  Accordingly, Mr. Damron's qualifications; the nature, extent, and scope of his responsibilities; and the size and complexities of petitioner's business all lead us to conclude that his compensation was reasonable.  See Estate of Wallace v. Commissioner, supra.

From its incorporation until its purchase by LKQ, petitioner consistently and rapidly increased in fair market value (FMV). Under the guidance and management of Mr. Damron, a corporation valued at $200,000 in 1984 grew to $12,500,000 in 1998. Respondent's expert opined that FMV increased from $3,755,510 in 1993 to $6,267,846 in 1995.[1]  Moreover, respondent's expert found that the maximum compensation (i.e., including bonus) should be $786,000, $1,145,000, and $1,144,000, relating to the respective years in issue (i.e., 68, 133, and 121 percent more than respondent allowed, respectively).

In essence, Mr. Damron rendered extensive and intensive services to petitioner that, according to petitioner's expert, resulted in a compound rate of return, from 1984 to 1998, of more than 39 percent per year.  Respondent's expert believed that investors in a firm like petitioner would expect a 14.3-percent return on their investment.  We conclude that an independent

---

[1]In an addendum submitted at trial, respondent's expert explained that when he prepared his original report he did not know petitioner had been sold in 1998 for $12,500,000.  The expert stated:  "Given the subsequent price paid for DAP [i.e., petitioner], our original returns analysis underestimated the value of DAP and, thus, overestimated the compensation available to Mr. Damron between 1993 and 1995."  Consequently, the expert presented an alternative analysis indicating that FMV increased from $7,357,619 in 1993 to $9,667,382 in 1995.  The expert added, however, that "The analysis based on the subsequent sale of DAP does not alter the conclusions in our original report".  Therefore, we do not accord great weight to the expert's alternative analysis and accept his original conclusion that FMV increased 67, rather than 31, percent from 1993 to 1995.

investor would have been quite satisfied with petitioner's consistent growth, solid management, and other indications that gains would continue.

Respondent contends that petitioner's accountant performed yearend planning "to severely limit petitioner's taxable income". The bonus calculations were performed at yearend because it was then that petitioner's accountant had all the information required to determine the appropriate amount of the payments. Our focus is on the reasonableness of the amounts, not the payment dates, of the compensation. The timing of the payments does not lead us to conclude that Mr. Damron's compensation was unreasonably high. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323, 1329 (5th Cir. 1987) (stating that "No single factor is decisive of the question * * * [although] such substantial bonuses declared at year-end when the earnings of a business are known usually indicate the existence of disguised dividends"), affg. T.C. Memo. 1985-267.

Respondent also contends that the amounts he allowed are "in line with" Mr. Damron's compensation as an LKQ employee. All the evidence presented at trial, however, established that Mr. Damron's responsibilities to LKQ were fewer, less stressful, and less time-consuming than his previous work for petitioner. In short, LKQ paid Mr. Damron less than petitioner paid because at LKQ he delegated more of his responsibilities.

Respondent contends that petitioner did not pay Mr. Damron to make up for past undercompensation because he had signed the Verification. We conclude that the Verification is irrelevant and that it did not preclude petitioner from paying for past services. See Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930) (stating that "compensation for past services, it being admitted that it was reasonable in amount in view of the large benefits which the corporation had received as the fruits of these services, the corporation had a right to pay, if it saw fit"). Even if portions were not attributable to past services, our conclusion would not change.

Accordingly, we hold that Mr. Damron's salary during the years in issue was reasonable.

II. Additions to Tax

Section 6651(a)(1) imposes an addition to tax for failure to file a required return on the date prescribed, unless it is shown that such failure is due to reasonable cause and not willful neglect. Petitioner's 1993 and 1994 returns were due on July 15, 1994, and July 17, 1995, but not filed before November 18, 1994, and August 2, 1995, respectively. Petitioner presented no evidence relating to this issue and did not address it on brief. It has not been shown that such failure is due to reasonable cause and not willful neglect. Accordingly, petitioner is liable for the section 6651(a)(1) additions to tax.

Contentions we have not addressed are moot, irrelevant, or meritless.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.