ERNEST BURWELL, Inc. v.
UNITED STATES.

Civ. A. No. 1347.

United States District Court
W. D. South Carolina,
Spartanburg Division.

June 10, 1953.

Neville Holcombe, Spartanburg, S. C., for plaintiff.

John C. Williams, U. S. Atty., and Chester D. Ward, Jr., Asst. U. S. Atty., Greenville, S. C., and Donald P. Hertzog, Sp. Asst. to Atty. Gen., Washington, D. C., for defendant.

WYCHE, Chief Judge.

In this action plaintiff is seeking to recover $4,117.05, which it paid as income and excess profit taxes alleged to have been erroneously and unlawfully assessed against it for the year 1941. These taxes are attributable solely to the Commissioner's disallowance of $6,000, of the $16,000, salary, which plaintiff paid in that year to its president and general manager, Ernest Burwell. The sole question involved is the reasonableness of this compensation.

In compliance with rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

Findings of Fact

The taxpayer is a corporation, which operates a Chevrolet automobile agency in Spartanburg, South Carolina. It was organized in 1924, by Ernest Burwell, who has served continuously as its president and general manager since that time. He supplied all the original capital. While the agency is operated by the corporation, the dealer's franchise is in the name of Ernest Burwell personally. In 1941, he and his wife owned, in substantially equal shares, all the capital stock except two qualifying shares issued to other directors. In the formative years of the corporation, his salary was kept low in order that the company's working capital might be built up. Prior to 1941, it had never exceeded $10,000 a year.

Plaintiff's president and general manager is recognized in the automobile retail field as a capable and competent dealer; he has served on a number of important planning and policy committees, both State and National, and is prominent in the work of the National Automobile Dealers Association; he is a frequent speaker at State Dealers' Conventions; in the fall of 1941, he, being a veteran of World War I and the holder of a commission in the Naval Reserve, was notified by the Commandant of the Sixth Naval District, with headquarters at Charleston, South Carolina, that if he would accept special assignment he might arrange his navy work in such a way as to enable him to carry on his automobile business efficiently, and that he might have such leave as might be necessary for that purpose; he entered active duty in November, 1940, and served more than five years. Throughout that time, he intended to, and in fact did, return to plaintiff's employ upon termination of his active duty; he served without pay until the summer of 1941, when it became apparent that this country would have to maintain a state of preparedness for an indefinite period of time; he was stationed throughout 1941, at Charleston, South Carolina, approximately 200 miles from Spartanburg; from there he continued the active supervision and direction of the business of the plaintiff; to facilitate communication with his office, he had a special telephone, in

no way connected with the Navy; no general manager was employed in his place; for all policy decisions, for general planning and direction, the department heads looked to him for instructions; he made frequent trips to Spartanburg; they made frequent trips to Charleston, or met him in Columbia, for consultations; he received frequent operating and progress reports from the company, and otherwise kept in close and constant contact with it; there were more than seventy long-distance calls in 1941, between him and his key-men; the correspondence between them was voluminous; he worked nights and Sundays to keep up with the business of the plaintiff, at the same time devoting his day-time Navy hours to his Navy duties; in 1940, his compensation was $10,000 per annum; on March 1, 1941, by formal action of the directors, his salary was fixed at $16,000 for that year.

The year 1941 brought on many new problems in the automobile field; it was a highly competitive year, but the transition from a peace-time to a war-time economy, which had been gradually coming on, was sharply accelerated after Pearl Harbor on December 7th, and the emphasis in plaintiff's business suddenly had to be shifted from sales to servicing. The draft and the lure of high wages in the war industries took a large part of plaintiff's personnel, and replacements had to be recruited and trained; plaintiff's secretary and treasurer, a highly valued employee, died in the spring of that year, and his place had to be filled; the Soldiers and Sailors Civil Relief Act, 50 U.S.C.A.Appendix, §§ 501, 510 et seq., posed new credit problems; a large-scale arrangement for the financing of automobile purchases had to be worked out with General Motors Acceptance Corporation; the solution of all these new problems rested primarily upon plaintiff's president and general manager.

A considerable part of plaintiff's production in 1941 was attributable to its president and general manager's efforts; he sold some fifty or sixty new cars; the value of these sales to plaintiff became apparent a year or two later when General Motors announced that cars would be allotted to dealers in the scarce post-war years on the basis of new cars sold by the dealers in 1941; at the request of the Transportation Officer of the Sixth Naval District, he put his organization into the field to buy up buses and trucks for the purpose of transporting war workers to Navy installations and war plants; these purchases yielded some profit to plaintiff, as did the repair of some Navy trucks which he had sent to Spartanburg for that purpose.

Although plaintiff paid some dividends in past years, none were paid in 1941, or in the several preceding years.

1941 was a very good business year for plaintiff. A comparison with the preceding three years, and with the year following, not only shows plaintiff's excellent record for 1941, but also demonstrates the cyclical nature of plaintiff's business. This comparison, in several aspects, is given below:

Gross Sales

| | |
|---|---|
| 1938 | $445,659.98 |
| 1939 | 540,274.59 |
| 1940 | 594,060.88 |
| 1941 | 855,694.36 |
| 1942 | 383,149.42 |

Net Income

| | |
|---|---|
| 1938 | $5,195.14 |
| 1939 | 7,128.48 |
| 1940 | 4,697.02 |
| 1941 | 28,512.77 |
| 1942 | 8,910.40 |

New Units Sold

| | |
|---|---|
| 1938 | 252 |
| 1939 | 330 |
| 1940 | 373 |
| 1941 | 548 |
| 1942 | 76 |

The ratio of plaintiff's president and general manager's compensation in 1941, to the new units sold, and to the total sales volume, is shown in the following tabulations:

Compensation Per New Unit Sold

| | |
|---|---|
| 1938 | $39.68 |
| 1939 | 30.30 |
| 1940 | 26.81 |
| 1941 | 29.20 |
| 1942 | 157.89 |

| Percentage of Sales Volume | |
| --- | --- |
| 1938 | 2.2% |
| 1939 | 1.8% |
| 1940 | 1.6% |
| 1941 | 1.9% |
| 1942 | 3.1% |

The average compensation paid to officers and managers in the Southeastern area, including Spartanburg, South Carolina, in 1941, amounted to approximately $30 per new unit sold. The compensation of $16,000, paid by plaintiff to its president and general manager in 1941, was considered reasonable in the trade.

Upon examination of plaintiff's 1941 return, the Commissioner at first disallowed all the compensation paid plaintiff's president and general manager in 1941. Subsequently, he allowed $10,000, and disallowed $6,000. The taxes involved in this action were paid June 28, 1945.

The salary of $16,000, paid by plaintiff in 1941, to its president and general manager was reasonable, and was paid for services actually rendered by him.

Opinion and Conclusions of Law

■ The Commissioner's determination carries a clear presumption of correctness, and places on the taxpayer the burden of proving that he is entitled to a greater deduction than the Commissioner allowed. Botany Worsted Mills v. United States, 1929, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379.

The statute permits a corporation, in computing its net income, to deduct a reasonable allowance for salaries or other compensation for personal services actually rendered. Internal Revenue Code, Title 26, United States Code, § 23(a) (1).

The Treasury Regulations, Reg. 111, Sec. 29.23(a)–6, state that the test is whether the compensation payments are (1) reasonable, and (2) in fact payments purely for services. The Regulations further provide: "It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances."

No definite criterion is established by law to gauge the reasonableness of compensation paid to a corporate employee. A number of factors are to be considered, but no single one is decisive. The relevant factors are listed in Mertens' Law of Federal Income Taxation, §§ 25.52 to 25.63, as follows: (1) The employee's qualifications; (2) extent and scope of employee's work; (3) prevailing rates of compensation; (4) size of the business; (5) ratio of salaries to gross income; (6) commission or percentage basis of payment; (7) general economic conditions; (8) salaries paid in prior years as comparative; (9) date of salary determination as a test; (10) evidentiary value of directors' action; (11) comparison of salaries with distributions to stockholders; (12) salaries paid in proportion to stock interest in corporation or to employees of closely held corporations.

A consideration of these factors demonstrates the reasonableness of the compensation paid to plaintiff's president and general manager in 1941; he was qualified by training and experience for the position he held with the company; he performed his work under trying and difficult conditions, at the same time serving his country (for about half the year without pay). The prevailing compensation rate per new car in 1941 was about $30. Measured by this test, his compensation would have slightly exceeded that actually paid; his compensation was fixed by formal action of the directors early in the year; it was a flat salary, not a figure fixed after the year's profits were known; while no dividends were paid in 1941, that policy had been followed for several years, and no deviation was made in that year to channel off earnings as salary rather than as dividends. It was shown that the compensation paid in 1941 was not proportionate to stock holdings in the corporation; the increase in his salary in 1941, over 1940, was justified by the many new problems and conditions encountered by him in 1941, and by the results accomplished through his management; he made an excellent showing for his company in spite of adverse conditions that forced many of his competitors out of business.

The defendant contends that the fixing of plaintiff's president and general manager's salary in 1941 was not an arm's length transaction, because he owned or controlled all the stock in the closely held corporation. The fixing of salaries of the sole stockholders between themselves and the corporation is not an arm's length transaction and, therefore, should be carefully scrutinized, "but as apposite to this it would also appear that the taxgatherers ought, in appropriate cases, to consider the fact that the sole stockholders often not only risk their capital and their credit, but also the loss of their time and effort, knowing full well that the corporation must first earn their salaries before they can be paid, and that the salaries of all other employees must be paid before theirs, and to that extent their salaries are, more or less, contingent. Generally contingent compensation is expected to be larger than compensation that is fixed and definite. It would not seem to be an unreasonable business practice for an employer to recognize and reward sacrifices made by employees in the hard, formative days by granting a more generous compensation in the days that are lush. Neither the statutes nor the regulations seem to require that this be done, unless they impliedly contain the concept that that which is right and that which is just would also be reasonable." Commercial Iron Works v. Commissioner of Int. Rev., 5 Cir., 1948, 166 F.2d 221, 224.

■ Plaintiff's president and general manager organized plaintiff's business in 1924, and for many years was paid, as he expressed it, "only grocery money". It seems to be settled that a close corporation, the business of which was built up through the efforts of stockholders who took only nominal salaries in earlier years, can deduct increased compensation which it pays after the business becomes successful; Woodruff Lumber Co. v. C. I. R., 6 B.T.A. 515; Union Dry Goods Co. v. C. I. R., 1 B.T.A. 833; the law does not require that the services should be actually rendered during the taxable year; deduction is allowed for compensation which is reasonable in amount for services rendered in the past. Lucas v. Ox Fibre Brush Co., 1930, 281 U.S. 115, 50 S.Ct. 273, 74 L.Ed. 733.

This principle is particularly applicable in the case of a cyclical business, such as plaintiff's when employees must draw varying salaries in good and bad years.

In Mertens' Law of Federal Income Taxation, § 25.48, it is stated: "Salaries paid by employers to employees who are called into, or volunteer for military service, but who intend to return at the conclusion of such service, are an allowable deduction." The Commissioner's ruling is to the same effect. See IT 3417. This rule was modified in a Bureau letter dated November 29, 1944, but the modification was in turn withdrawn in a ruling of the Commissioner dated March 14, 1945. See Prentice-Hall 1953 Tax Service, § 11,712.

Several automobile dealers of experience and integrity testified, without contradiction, that the salary of $16,000, paid to plaintiff's president and general manager in 1941, taking into account his absence in the Navy, was reasonable. The president and general manager of a business need not necessarily be physically present. His work lies in the realm of planning, policy-making and business relationships. He may do, and often does, his most effective work far from the site of his business.

■ None of plaintiff's witnesses were contradicted; the defendant offered no testimony. Where taxpayer's witnesses on the question of reasonableness of compensation are qualified and unimpeached, as plaintiff's witnesses were in this case, and no evidence is given to the contrary, their testimony should be accepted. Wright-Bernet v. Commissioner of Internal Revenue, 6 Cir., 1949, 172 F.2d 343; Roth Office Equipment Co. v. Gallagher, 6 Cir., 1949, 172 F.2d 452.

■ The salary of $16,000, paid by plaintiff in 1941, to its president and general manager, is, therefore, deductible in full by plaintiff in computing its net income for that year, and the plaintiff has sustained the burden of proving by the greater weight of the evidence, the error of the Commissioner's assessment for 1941, with respect to the taxes involved in this action.

It is therefore my opinion that plaintiff is entitled to judgment against the defendant for $4,117.05, with interest at the rate of six

per cent. per annum from June 28, 1945, the date of plaintiff's payment of the taxes, until the judgment is satisfied.

Entry of appropriate judgment is directed accordingly, and

It is so ordered.