BRUCE OIL COMPANY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bruce Oil Co. v. Commissioner
Docket Nos. 11389-81, 11390-81, 11391-81, 11392-81, 11393-81, 11394-81, 11395-81, 11396-81, 11397-81.
United States Tax Court
T.C. Memo 1984-230; 1984 Tax Ct. Memo LEXIS 441; 47 T.C.M. (CCH) 1728; T.C.M. (RIA) 84230; April 30, 1984. *441 During 1977, P was the president and chief operating officer of 8 corporations, which operated retail gasoline stations and related businesses. The businesses were successful, and P made all the significant business decisions and dominated the businesses. However, the corporations never paid a dividend, and the alleged compensation was paid in proportion to the officers' stockholdings and was largely paid as bonuses which were declared at the end of the year and which were not paid pursuant to any formula. During 1977, some of the corporations paid certain travel and entertainment expenses. Held: (1) Under all the circumstances, part of P's compensation was a dividend distribution; amount of reasonable compensation determined. (2) Travel and entertainment expenses paid by the corporations are constructive dividends to P. Louis S. Freeman and J. Patrick Dowdall, for the petitioners. Thomas E. Ritter, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Taxable
Docket No.
Petitioner
Year Ended
Deficiency
11389-81
Bruce Oil Company
12/31/77
$ 9,164.70
11390-81
5300 Car Wash Company
12/31/77
6,678.33
11391-81
B & J Liberty Super
Service Station, Inc.
12/31/77
10,869.72
11392-81
Jim's Friendly Service
Station, Inc.
12/31/77
27,327.17
11393-81
Lincoln-Talman Service
Station, Inc.
12/31/77
949.38
11394-81
Hasti Car Wash Company
12/31/77
13,089.45
11396-81
James C. and Marilyn
Neumann
12/31/77
[2] *442 $28,847.00
11397-81
Eagle Super Service
Station, Inc.
12/31/77
8,604.06
In docket No. 11395-81, the Commissioner also determined that James C. Neumann was liable as a transferee for the deficiency of Capri Oil Company for its taxable year ended April 30, 1978, in the amount of $16,197.07. After concessions by the parties, the issues for decision are: (1) Whether amounts paid by the corporate petitioners and by Capri Oil Company to James C. Neumann during 1977 constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1) of the Internal Revenue Code of 1954; [3] *443 and (2) whether the petitioner, James C. Neumann, received constructive dividends from some of the corporate petitioners and from Capri Oil Company during 1977 as a result of their paying certain travel and entertainment expenses. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. Each of the corporate petitioners had its principal place of business in Illinois when its petition was filed, and both of the individual petitioners had their legal residence in Illinois when their petition was filed. All of the corporate petitioners filed their Federal income tax returns for 1977 with the Internal Revenue Service Center, Kansas City, Mo. The individual petitioners filed their joint Federal income tax return for 1977 with the same service center. The corporate petitioners and Capri Oil Company will sometimes be referred to as the corporations, and Mr. Neumann will sometimes be referred to as the petitioner. The petitioner has been in the retail gasoline business all his adult life. He began working part-time at the age of 13, pumping gas and greasing cars for his uncle who owned a chain of stations. After military service in World War II, the petitioner returned to work in one of his uncle's stations. In 1948, he leased his first station from his uncle. The station was operated in an innovative manner in that it was the first station in Chicago to rely *444 for its profitability principally on selling a large volume of a major brand of gasoline. In order to sell a large volume, the station sold gasoline at a reduced price. The station did not do repair work and did not sell tires, batteries, or accessories. In subsequent years, the petitioner conducted his business through a number of corporations. Bruce Oil Company (Bruce Oil), an Illinois corporation, was incorporated on January 1, 1961. During 1977, Bruce Oil owned and operated a retail gasoline station and convenience mini-store in Chicago. The petitioner owned all the outstanding stock of Bruce Oil during 1977. 5300 Car Wash Company (5300 Car Wash), an Illinois corporation, was incorporated on May 17, 1961. During 1977, 5300 Car Wash operated a retail gasoline station and car wash in Chicago. Until July 7, 1977, the outstanding stock of 5300 Car Wash was owned 75 percent by the petitioner and 25 percent by Howard Neumann (Howard), the petitioner's brother. Pursuant to a consent of the shareholders and directors dated July 7, 1977, all of Howard's stock was redeemed by the corporation. Thereafter, the petitioner owned all of the outstanding stock of 5300 CarWash.
B & J *445 Liberty Super Service Station, Inc. (B & J Liberty), an Illinois corporation, was incorporated on January 1, 1961. During 1977, B & J Liberty owned and operated a retail gasoline station and car wash in Chicago. Until July 7, 1977, the outstanding stock of B & J Liberty was owned 51 percent by the petitioner and 49 percent by Howard. Pursuant to a consent of the shareholders and directors dated July 7, 1977, all of Howard's stock was redeemed by the corporation. Thereafter, the petitioner owned all of the outstanding stock of B & J Liberty. Jim's Friendly Service Station, Inc. (Jim's Friendly), an Illinois corporation, was incorporated on January 1, 1961. During 1977, Jim's Friendly owned and operated two retail gasoline stations and convenience mini-stores--Jim's Friendly-Ashland, which was located in Chicago, and Jim's Friendly-Dempster, which was located in Skokie, Ill. Jim's Friendly also owned another retail gasoline station, Jim's Friendly-Go-Lo, which was located in Schaumburg, Ill. During 1977, the petitioner owned all of the outstanding stock of Jim's Friendly. Lincoln-Talman Service Station, Inc. (Lincoln-Talman), an Illinois corporation, was incorporated on June *446 1, 1963. Lincoln-Talman owned and operated a retail gasoline station and convenience mini-store in Chicago. Until July 7, 1977, the outstanding stock of Lincoln-Talman was owned 75 percent by the petitioner and 25 percent by Howard. Pursuant to a consent of the shareholders and directors dated July 7, 1977, all of Howard's stock was redeemed by the corporation. Thereafter, the petitioner owned all of the outstanding stock of Lincoln-Talman. Hasti Car Wash Company (Hasti Car Wash), an Illinois corporation, was incorporated on May 13, 1965. During 1977, Hasti Car Wash owned and operated a retail gasoline station and car wash in Chicago. The petitioner owned all of the outstanding stock of Hasti Car Wash during 1977. Eagle Super Service Station, Inc. (Eagle), an Illinois corporation, was incorporated on January 1, 1961. During 1977, Eagle operated a retail gasoline station and car wash in Oak Park, Ill. The petitioner owned all of the outstanding stock of Eagle during 1977. The petitioner is the transferee of Capri Oil Company (Capri Oil). Capri Oil was an Illinois corporation, incorporated on May 29, 1956. During 1977, it owned and operated two retail gasoline stations and *447 convenience mini-stores located in Chicago, Capri-Central and Capri-Clark. Until July 7, 1977, the outstanding stock of Capri Oil was owned 75 percent by the petitioner and 25 percent by Howard. Pursuant to a consent of the shareholders and directors dated July 7, 1977, all of Howard's stock was redeemed by the corporation. Thereafter, the petitioner owned all of the outstanding stock of Capri Oil. Capri Oil was liquidated and dissolved as of April 27, 1979. Subsequent to the liquidation, the petitioner, as transferee of the liquidated assets of Capri Oil, executed a transferee agreement, whereby he agreed to pay the amounts of any and all Federal income or profits taxes finally determined to be due and payable by Capri Oil for the fiscal year ended April 30, 1978. During 1977 and in all prior years, the petitioner was the president and chief executive officer of each of the corporations. Prior to and during part of 1977, Howard was employed by and received both a salary and a bonus from the corporations in which he had stock. Howard worked primarily for B & J Liberty, where he supervised the station managers. He also personally checked the operations at the stations of the other *448 corporations in which he had stock. Howard's stock was redeemed by the corporations pursuant to an agreement between Howard and the petitioner dated July 7, 1977. Howard received $75,000 for his stock in 5300 Car Wash, $105,000 for his stock in Lincoln-Talman, $265,000 for his stock in B & J Liberty, and $230,000 for his stock in Capri Oil. The negotiations leading up to the redemption began in 1972 and were often acrimonious. Before an agreement was reached, Howard had wanted more for his stock than the petitioner was willing to offer, and he had threatened to sue the petitioner over the petitioner's conduct of certain aspects of the business. The petitioner, before the 1977 agreement was reached, believed that Howard's compensation from the corporations was too high, and the petitioner considered reducing Howard's compensation. However, he did not because he did not want to exacerbate relations with his brother. All of the gasoline stations were located between one and three blocks from a major intersection or were located on a major thoroughfare. In addition to petroleum products and cigarettes, some of the stations also sold other items, including plastic children's toys. *449 A "branded" retail gasoline station is one affiliated with a major oil company which supplies its products. An "independent" or "unbranded" retail gasoline station is one that is not affiliated with a major oil company. Its products are purchased from various sources. The principal food products sold at the convenience mini-stores were milk, certain other dairy products, refrigerated products (such as juices and luncheon meats), bread and other baked goods, snack items (such as potato chips and candy), and assorted other items. In 1971 and 1972, there was intense price competition among gasoline stations in the Chicago area. As of 1972, the typical branded retail gasoline station dealer operated a single station pursuant to a short-term lease and retail dealer supply contract with the major oil company with which he was affiliated. Typically, such contracts were for 1- to 3- year periods with 30-day cancellation clauses for infractions of the contract. Tye typical branded station had relatively few gasoline pumps, had repair bays for repair work, and sold tires, batteries, and accessories. Generally, the branded stations relied on non-gasoline products (such as repairs, tires, *450 batteries, and accessories) for their profitability. The typical unbranded dealer operated a station that he owned and purchased unbranded gasoline from various sources, including independent refiners and various wholesale distributors. Generally, unbranded dealers relied for their profitability, to a larger extent than branded dealers, on selling a large volume of gasoline. They generally sold gasoline at prices lower than branded dealers, and they generally did not do repair work and did not sell tires, batteries, or accessories. During the 1970s, the retail gasoline industry was characterized by substantial instability and change. The major oil companies increasingly sought to make the retail marketing of gasoline more profitable. Prior to this time, they had derived most of their profits from crude oil production. The profitability of crude oil production decreased in the early 1970s because of such factors as the elimination of the crude oil depletion allowance and the increased control of world oil prices and supplies by OPEC. In 1973, there was a significant decrease in the available supply of gasoline due primarily to the Oil Embargo of 1973. Such shortages led to increases *451 in the price of gasoline, long lines and shortened hours at service stations, and the permanent closing of some stations, particularly unbranded stations. Gasoline shortages in 1973 and 1974 resulted in increased price margins for the retail dealers who could obtain sufficient supplies. However, from 1975 through 1978, the price margins on gasoline became increasingly smaller. In their attempt to increase the profitability of the marketing of gasoline, the major oil companies encouraged branded retail dealers to sell larger volumes of gasoline and to de-emphasize repairs and tire, battery, and accessories sales. During this period, a significant number of leases and dealer contracts of branded retail dealers were canceled. This period also saw a growth in the number of convenience stores and car washes associated with retail gasoline stations. Over a period of years, the petitioner acquired a number of stations. In many instances, the stations had not been managed profitably by their previous operators. Some of the facilities were older. The petitioner converted the stations to high-volume gasoline stations and eliminated repair and greasing operations.During this period, it *452 was unusual for any major, oil company to lease more than one station to a single dealer. Originally, the petitioner leased most of his stations from the Mobil Oil Corporation (Mobil) and operated them as Mobil branded stations. It was Mobil's policy not to recognize corporations on leases or contracts. Thus, retail dealer contracts, as well as equipment loan agreements and sign and equipment leases, were entered into between Mobil and the petitioner, doing business as the various corporations. The petitioner also personally guaranteed loans made to the corporations. During 1977, one corporation had over $200,000 in outstanding loans. Over the years, the petitioner purchased a number of stations from Mobil. During the period that he acquired the stations from Mobil, it was unusual for Mobil to sell stations to retail dealers. As a result of having obtained the stations, the petitioner was able to exercise significant leverage in his negotiations with Mobil. The petitioner also leased or purchased stations from other parties, and he built two stations. During 1977, with the exception of two stations, each of the petitioner's stations was a branded station operated under the Mobil *453 brand name. The other two stations were operated as independent or unbranded stations. In his long relationship with Mobil, the petitioner has engaged in virtually continuous negotiations with Mobil concerning a variety of matters, including price discounts for gasoline purchased for the Mobil branded stations, the acquisition of leases and dealer contracts for the stations, and the purchase of stations. Early in his relationship with Mobil, the petitioner obtained various kinds of discounts, such as reduced rents, reimbursement for unility bills, and eventually a 1-cent-a-gallon discount for each gallon of gasoline purchased. At one time, Mobil supplied the petitioner's stations with gasoline through a special distributor at a reduced rate. Later, the petitioner operated as a Mobil distributor even though he did not own a distribution facility, which was the usual requirement for a distributor. This arrangement was subsequently canceled. Thereafter, Mobil agreed to supply the petitioner's Mobil branded stations with gasoline at a price that was less than the price at which Mobil generally sold gasoline to its retail dealers in Chicago, that is, a competitive price allowance. *454 In the early 1970s, Mobil agreed to competitive price allowances that were cancelable. When Mobil threatened to cancel such allowances, the petitioner sought other suppliers, and he used the possibility that he might change suppliers to induce Mobil to grant him concessions, including making the agreement noncancelable. During 1977, the petitioner had a noncancelable, 2.45-cents-per-gallon competitive price allowance. During the period that the petitioner negotiated the agreements with Mobil, a number of branded dealers had their leases and dealer contracts canceled by major oil companies. According to compilations of the National Petroleum News, using United States Commerce Department and Census Bureau data, the number of gasoline stations in the United States in 1977 was 176,761.In 1972, there were 224,957 such stations. In Illinois, there were 7,954 stations in 1977, compared with 10,211 in 1972. The petitioner received competitive price allowances that were greater than those received by other dealers in Chicago. In addition, no other Chicago area branded dealer had a noncancelable contract with respect to competitive price allowances. In the course of his operation of the *455 stations, the petitioner utilized a number of innovative selling techniques. He started a gasoline discount club. Upon payment of a small initiation fee, club members were entitled to purchase gasoline at a discount price. He also sold cigarettes, milk, and bread at or below cost in order to attract customers to the gasoline stations. In another innovative program designed to sell gasoline, gasoline customers were given coupons which could be exchanged for free or reduced-price car washes. Such program was still in operation in 1977. During 1977, retail gasoline dealers had to operate within the gasoline allocations set forth in the Mandatory Petroleum Allocation Regulations by the Department of Energy (DOE) and its predecessors, including the Federal Energy Administration (FEA). Originally, each of the stations was assigned a separate allocation. Later, the petitioner succeeded in obtaining a single allocation for all the corporations, which allowed him to distribute the aggregate allocation among the various stations. During 1977, the petitioner's stations sold the following number of gallons of gasoline: Bruce Oil
2,957,278
5300 Car Wash
2,394,704
B & J Liberty
2,575,724
Jim's Friendly - Ashland
2,909,441
Jim's Friendly - Dempster
3,710,791
Jim's Friendly - Go-Lo
2,705,843
Lincoln-Talman
3,082,233
Hasti Car Wash
1,653,246
Eagle
2,213,383
Capri - Central
3,124,516
Capri - Clark
3,505,242
TOTAL
30,832,401
*456 According to one study, the average number of gallons of gasoline sold by stations in the Chicago North area was 453,000 gallons per year. The study indicated that the dealers involved in the study tended to be above average. During 1977, each of the stations that operated a car wash sold only full-service car washes. With a full-service car wash, both the interior and the exterior of the car are cleaned. In 1976, the petitioner began planning for the renovation and expansion of one of his car washes and for its conversion to an exterior-only car wash.With an exterior-only car wash, the costs are less, and the price of a car wash can be reduced. From 1975 through 1979, the corporations sold the following number of car washes and waxes: Years
Car Washes
Waxes
1975
373,273
124,484
1976
424,114
131,503
1977
407,819
113,625
1978
362,797
98,181
1979
304,641
61,118
During 1977, the corporations employed the following number of full-time and part-time employees: Bruce Oil
45
5300 Car Wash
172
B & J Liberty
131
Jim's Friendly
132
Lincoln-Talman
134
Hasti Car Wash
102
Eagle
96
Capri Oil
215
TOTAL
1,027
During 1977, the petitioner maintained two homes. One home was located in Lincolnwood, Ill., and the other was located *457 in Miami, Fla. The petitioner purchased his home in Miami in 1972. In 1977, the petitioner spent all his time in Chicago during June, July, and August. From September through May, he spent approximately half his time in Chicago and half his time in Miami. The petitioner's wife and dependent son generally lived at the house in Miami from September through May. The petitioner maintained an office in each of his homes. During 1977, he conducted a significant portion of his business over the telephone, and he worked a portion of each day of the week, whether in Chicago or Miami. During 1977, each of the petitioner's stations had a manager. The station manager was responsible for overseeing the daily operations of the station. He made sure that the station was staffed properly and kept records of the employees' schedules. The station manager was responsible for forwarding certain information to the corporations' accountants. In addition, he looked after general maintenance of the station, including cleanliness. He was required to keep track of the inventory and reported to the supervisor the items that were in short supply. At some stations, the station manager also pumped gas. *458 Subject to the supervision of the supervisor, the station manager generally hired gas and car wash attendants. During 1977, the station managers were paid between $20,000 and $35,000 per year. A full-time supervisor oversaw all of the stations. During 1977, the supervisor was the petitioner's 27-year-old son, Mark Neumann (Mark). If the supervisor was absent, the senior station manager, who had been employed by the petitioner since 1948, undertook the supervisor's responsibilities. In 1977, the station manager who filled in for the supervisor was paid $35,620. The supervisor checked the inventory at the various stations and was responsible for the ordering of gasoline and other products based on his instructions from the petitioner. The supervisor conducted initial job interviews for station managers and consulted with the station managers concerning the hiring of gas attendants and other personnel.
During 1977, the petitioner spoke daily with his supervisor, Mark. Each morning, Mark spoke to each of the station managers by phone and compiled information with respect to the previous day's sales, inventories, staffing, and other concerns. Mark then called the petitioner and *459 transmitted the information to him. Based on such conversations, the petitioner decided, among other things, the amount of gasoline to be ordered. The phone calls between the petitioner and Mark varied in length from 30 minutes to 2 hours. Typically, during the course of the day, the petitioner spoke to Mark several times. During 1977, the petitioner took two or three short vacations but remained in daily contact with Mark concerning the stations. During 1977, in deciding each day how much gasoline to order for the stations, the petitioner attempted to anticipate movements in the wholesale price of gasoline. Thus, if he thought that the wholesale price was about to rise, he instructed Mark to keep the levels of inventory at the various stations high and to order enough gasoline to maintain those levels. If he anticipated that the wholesale price were going to fall, he told Mark to keep the inventories low. The petitioner based his projections on his knowledge of the retail gasoline business and conversations with various individuals in the business. The petitioner, in deciding the prices to be charged by each of the stations for gasoline, also kept track of the current prices *460 for the various grades of gasoline charged by his competitiors. Such information was compiled by the station managers at various times during the week. Generally, the station managers forwarded information concerning 20 to 30 competitors for each station. In addition, the petitioner kept track of the wholesale prices of the major oil companies, as well as those of some of the independent oil companies. The petitioner obtained such information from various sources, and it enabled him to determine how much his competitors were paying their wholesalers for their gasoline. The petitioner also kept track of the number of car washes, the products sold by the convenience stores, and the number of employees and their salaries for each of the car washes and stations. Based on his analysis of his competitors' retail and wholesale prices, as well as other factors, the petitioner decided the prices to be charged by each of his stations for the various grades of gasoline. He did not simply alter his prices to account for changes in the prices charged by his suppliers. Experience demonstrated that sudden increases in the retail prices could have a negative impact on the amount of business done *461 by the stations. Therefore, the petitioner, rather than simply passing on wholesale price increases, sought to gradually increase his retail prices. The petitioner's pricing decisions were made separately for each of the stations and for each of the various grades of gasoline. During 1977 and prior years, the petitioner dominated all aspects of the policies and operations of the corporations. In addition to pricing and inventory, he was solely responsible for all decisions concerning the acquisition and disposition of properties, as well as capital improvements. He handled all negotiations and financing for the corporations. He made all decisions regarding the hours of operation of the stations, business strategies, marketing techniques, advertising, and promotions. In addition, he was concerned with all legal and accounting aspects of the corporations, and he hired all station managers. For the taxable years 1972 through 1978, the corporations' gross receipts, net profits, salary and bonus payments to the petitioner and Howard, total officers' compensation as a percent of gross receipts and of adjusted net profits, bonuses as a percent of the officers' compensation, and petitioner's *462 and Howard's compensation as a percent of total officers' compensation are set forth in the following tables. The amounts of such net profits, which were submitted by the parties by stipulation, were apparently computed after allowance of the deduction for officers' compensation. For the purpose of showing the relationship between such compensation and net profits, we have adjusted net profits by adding to the stipulated amounts the amounts of officers' compensation. BRUCE OIL
1972
1973
1974
1975
Gross
receipts
$850,363
$955,713
$1,597,292
$1,865,214
Net profits
23,474
60,520
79,340
15,543
Petitioner's
compensation: Salary
1,500
1,500
1,500
1,500
Bonus
15,000
25,000
35,000
25,000
Total
compensation
$ 16,500
$ 26,500
$ 36,500
$ 26,500
Officers'
compensation as
a percent of
gross receipts
1.9
2.8
2.3
1.4
Officers'
compensation as
a percent of
adjusted net
profits
41
30
32
63
Bonus as a
percent of
officers'
compensation
91
94
96
94
1976
1977
1978
Gorss
receipts
$1,996,078
$2,071,542 $1,873,363 Net profits
12,005
(2,146)
(14,267)
Petitioner's
compensation: Salary
1,500
12,000 12,000 Bonus
29,000
18,500 20,000 Total
compensation$ 30,500
$ 30,500 $ 32,000 Officers'
compensation as
a percent of
gross receipts
1.5
1.5 1.7 Officers'
compensation as
a percent of
adjusted net
profits
72
108 180 Bonus as a
percent of
officers'
compensation
95
61 63 *463 5300 Car Wash
1972
1973
1974
1975
Gross
receipts
$649,122
$726,221
$960,157
$1,144,090 Net profits
20,145
41,225
18,774
(11,197)
Petitioner's
compensation: Salary
8,400
8,400
8,400
8,400 Bonus
19,500
22,500
22,500
15,000 Total
$ 27,900
$ 30,900
$ 30,900
$ 23,400 compensation
Howard's
compensation: Salary
$ 1,200
1,200
1,200
1,200 Bonus
6,500
7,500
7,500
5,000 Total
compensation
$ 7,700
$ 8,700
$ 8,700
$ 6,200 Officers' compensa-
tion as a percent
of gross receipts
5.5
5.5
4.1
2.6
Officers' compensa-
tion as a percent
of adjusted net
profits
64
49
68
161 Bonuses as a percent
of officers'
compensation
73
76
76
68 Petitioner's compen-
sation as a percent
of officers'
compensation
78
78
78
79 Howard's compensa-
tion as a percent
of officers'
compensation
22
22
22
21 1976
1977
1978
Gross
receipts
$1,551,790
$1,775,699
$1,436,196 Net profits
25,434
41,606
(15,751)
Petitioner's
compensation: Salary
8,400
8,400
8,400 Bonus
15,000
15,000
17,000 Total
$ 23,400
$ 23,400
$ 25,400 compensation
Howard's
compensation: Salary
1,200
Bonus
5,000
Total
compensation
$ 6,200
$ 3,616.67
Officers' compensa-
tion as a percent
of gross receipts
1.9
1.5
1.8 Officers' compensa-
tion as a percent
of adjusted net
profits
54
39
263 Bonuses as a percent
of officers'
compensation
68
56
67 Petitioner's compen-
sation as a percent
of officers'
compensation
79
87
100 Howard's compensa-
tion as a percent
of officers'
compensation
21
13
*464 B & J LIBERTY
1972
1973
1974
1975
Gross
receipts
$972,089
$1,156,449
$1,707,161
$1,864,097
Net profits
39,098
73,168
123,545
18,371
Petitioner's
compensation: Salary
14,500
14,500
14,500
14,500
Bonus
7,500
7,500
8,500
11,000
Total
compensation
$ 22,000
$ 22,000
$ 23,000
$ 25,500
Howard's
compensation: Salary
$ 14,500
$ 14,500
$ 14,500
$ 14,500
Bonus
7,500
7,500
8,500
11,000
Total
compensation
$ 22,000
$ 22,000
$ 23,000
$ 25,500
Officers' compensa-
tion as a percent
of gross receipts
4.5
3.8
2.7
2.7
Officers' compensa-
tion as a percent
of adjusted net
profits
53
38
27
74
Bonuses as a
percent of
officers'
compensation
34
34
37
43
Petitioner's compen-
sation as a
percent of
officers'
compensation
50
50
50
50
Howard's compensa-
tion as a percent
of officers'
compensation
50
50
50
50
1976
1977
1978
Gross
receipts
$2,130,423
$2,123,868
$1,982,350
Net profits
105,761
55,274
30,195
Petitioner's
compensation: Salary
14,500
19,400
19,700
Bonus
11,000
10,000
15,000
Total
compensation
$ 25,500
$ 29,400
$ 34,700
Howard's
compensation: Salary
$ 14,500
Bonus
11,000
Total
compensation
$ 25,500
$24,241.67
Officers' compensa-
tion as a percent
of gross receipts
2.4
2.5
1.8
Officers' compensa-
tion as a percent
of adjusted net
profits
33
49
53
Bonuses as a
percent of
officers'
compensation
43
19
43
Petitioner's compen-
sation as a
percent of
officers'
compensation
50
55
100
Howard's compensa-
tion as a percent
of officers'
compensation
50
45
*465 JIM'S FRIENDLY
1972
1973
1974
1975
Gross
receipts
$1,772,233
$1,855,431
$2,406,378
$4,016,378
Net profits
45,316
93,261
95,597
68,768
Petitioner's
compensation: Salary
1,500
1,500
1,500
1,500
Bonus
5,000
10,000
15,000
40,000
Total
compensation
$ 6,500
$ 11,500
$ 16,500
$ 41,500
Officers'
compensation
as a percent
of gross
receipts
.4
.6
.7
1.0
Officers'
compensation
as a percent
of adjusted
net profits
13
11
15
38
Bonus as a percent
of officers'
compensation
77
87
91
96
1976
1977
1978
Gross
receipts
$5,224,977
$6,115,940
$5,519,746 Net profits
93,091
3,125
(43,044)
Petitioner's
compensation: Salary
1,500
12,000
12,000 Bonus
63,000
52,500
55,000 Total
compensation
$ 64,500
$ 64,500
$ 67,000 Officers'
compensation
as a percent
of gross
receipts
1.2
1.1
1.2 Officers'
compensation
as a percent
of adjusted
net profits
41
95
280 Bonus as a percent
of officers'
compensation
98
81
82 LINCOLN-TALMAN
1972
1973
1974
1975
Gross
receipts
$828,612
$845,606
$1,238,172
$1,547,126
Net profits
17,936
48,936
79,569
329
Petitioner's
compensation: Salary
Bonus
3,000
4,500
4,500
Total
compensation
$ 3,000
$ 4,500
$ 4,500
Howard's
compensation: Salary
Bonus
1,000
1,500
1,500
Total
compensation
$ 1,000
$ 1,500
$ 1,500
Officers' compensation
as a percent
of gross receipts
.5
.5
.4
Officers' compensation
as a percent
of adjusted net
profits
18
7
95
Bonuses as a percent
of officers'
compensation
100
100
100
Petitioner's compensation
as a percent
of officers'
compensation
75
75
75
Howard's compensation
as a percent
of officers'
compensation
25
25
25
*466 1976
1977
1978
Gross
receipts
$2,223,038
$2,024,007 $1,466,394 Net profits
13,320
(11,747)
(27,523)
Petitioner's
compensation: Salary
Bonus
4,500
4,500 Total
compensation
$ 4,500
$ 4,500 Howard's
compensation: Salary
Bonus
1,500
875 Total
compensation$ 1,500
$ 875 Officers' compensation
as a percent
of gross receipts
.3
.3 Officers' compensation
as a percent
of adjusted net
profits
31
Bonuses as a percent
of officers'
compensation
100
100 Petitioner's compensation
as a percent
of officers'
compensation
75
84 Howard's compensation
as a percent
of officers'
compensation
25
16 HASTI CAR WASH
1972
1973
1974
1975
Gross
receipts
$637,679
$706,442
$1,018,434
$1,164,556
Net profits
24,803
42,501
60,820
19,764
Petitioner's
compensation: Salary
Bonus
20,000
15,000
20,000
15,000
Total
compensation
$ 20,000
$ 15,000
$ 20,000
$ 15,000
Officers' compensation
as a percent
of gross receipts
3.1
2.1
2.0
1.3
Officers' compensation
as a percent
of adjusted net
profits
45
26
25
43
Bonus as percent
of officers'
compensation
100
100
100
100
1976
1977
1978
Gross
receipts
$1,331,700
$1,293,423
$1,179,964
Net profits
32,123
27,120
12,545
Petitioner's
compensation: Salary
6,000
6,000
Bonus
20,000
20,000
26,000
Total
compensation
$ 20,000
$ 26,000
$ 32,000
Officers' compensation
as a percent
of gross receipts
1.5
2.0
2.7
Officers' compensation
as a percent
of adjusted net
profits
38
49
72
Bonus as a percent
of officers'
compensation
100
77
81
EAGLE *467 1972
1973
1974
1975
Gross receipts
$599,919
$688,314
$944,283
$1,185,286
Net profits
52,052
52,989
14,080
Petitioner's
compensation: Salary
1,500
1,500
1,500
1,500
Bonus
10,000
10,000
15,000
12,000
Total
compensation
$ 11,500
$ 11,500
$ 16,500
$ 13,500
Officers'
compensation
as a percent
of gross
receipts
1.9
1.7
1.7
1.1
Officers'
compensation
as a percent
of adjusted
net profits
18
24
49
Bonus as a
percent of
officers'
compensation
87
87
91
89
1976
1977
1978
Gross receipts
$1,288,317
$1,548,632
$1,298,043 Net profits
14,079
26,602
(7,431)
Petitioner's
compensation: Salary
1,500
1,500
1,500 Bonus
12,000
18,500
20,000 Total
compensation
$ 13,500
$ 20,000
$ 21,500 Officers'
compensation
as a percent
of gross
receipts
1.0
1.3
1.7 Officers'
compensation
as a percent
of adjusted
net profits
49
43
153 Bonus as a
percent of
officers'
compensation
89
93
93 CAPRI OIL
Year Ended April 30--
1973
1974
1975
Gross receipts
$1,746,386
$2,337,351
$3,051,467
Net profits
23,773
141,373
99,659
Petitioner's
compensation: Salary
13,200
13,200
13,200
Bonus
15,000
30,000
30,000
Total
compensation
$ 28,200
$ 43,200
$ 43,200
Howard's
compensation: Salary
6,000
6,000
6,000
Bonus
5,000
10,000
10,000
Total
compensation
$ 11,000
$ 16,000
$ 16,000
Officers ' compensation
as a percent
of gross receipts
2.2
2.5
1.9
Officers' compensation
as a percent
of adjusted net
profits
62
30
37
Bonuses as a percent
of officers'
compensation
51
68
68
Petitioner's compensation
as a percent
of officers'
compensation
72
73
73
Howard's compensation
as a percent of
officers' compenstion
28
27
27
Year Ended April 30--
1976
1977
1978
Gross receipts
$4,350,327
$4,977,916 $4,368,177
Net profits
18,659
(12,115)
8,256
Petitioner's
compensation: Salary
13,200
13,200 17,000
Bonus
30,000
30,000 35,000
Total
compensation
$ 43,200
$ 43,200 $ 52,000
Howard's
compensation: Salary
6,000
6,000 Bonus
10,000
10,000 Total
compensation$ 16,000
$ 16,000 $ 4,000
Officers' compensation
as a percent
of gross receipts
1.4
1.2 1.3
Officers' compensation
as a percent
of adjusted net
profits
76
126 87
Bonuses as a percent
of officers'
compensation
68
68 63
Petitioner's compensation
as a percent
of officers'
compensation
73
73 93
Howard's compensation
as a percent of
officers' compensation
27
27 7
*468 According to "Franchising in the Economy, 1976-1978," Office of Consumer Goods and Services, Department of Commerce, the average sale of products and services for retail gasoline stations in the United States during 1977 was approximately $297,000. At no time from incorporation through the taxable year 1978 did any of the corporations pay dividends to any of its shareholders.In addition, during the taxable years 1972 through 1977, none of the corporations maintained any profit-sharing, pension, or other form of deferred compensation plan for the petitioner's benefit. From 1972 through 1978, the officers' bonuses were declared and paid by each of the corporations in the last month of its taxable year. When the petitioner's 1977 bonuses were declared by the board of directors of each of the corporations, the petitioner, Marilyn Neumann (his wife), and Mark comprised the board of directors of each of the corporations. Prior to his resignation, dated July 7, 1977, Howard had been a director in those corporations in which he had stock. The tax returns of the corporations for 1973 through 1976 were examined by the Internal Revenue Service, and no adjustments were made in connection with *469 the amount of compensation paid by the corporations. On the tax returns for the year at issue, the corporations deducted a total of $250,300 as compensation paid to the petitioner. On such returns, the corporations deducted the following amounts as travel and entertainment expenses: Bruce Oil
$738.70
5300 Car Wash
513.20
B & J Liberty
3,245.24
Jim's Friendly
755.50
Lincoln-Talman
1,977.87
Hasti Car Wash
4,465.51
Capri Oil
832.61
In his notices of deficiency, the Commissioner determined that the compensation paid to the petitioner was excessive and allowed each corporation a deduction of $10,000 for compensation paid to the petitioner. He also determined that the excessive compensation represented dividends received by the petitioner to the extent of $133,800. [4] The Commissioner also disallowed the deductions for travel and entertainment and treated the amounts thereof as constructive dividends received by the petitioner. OPINION The first issue for decision is whether amounts paid by the corporations to the petitioner during the year at issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1), which, in part, provides: (a) *470 In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; The question is one of fact to be resolved on the basis of an examination of all the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court.The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of the compensation is upon the petitioner. Botany Worsted Mills v. United States,278 U.S. 282 (1929); The Barton-Gillet Co. v. Commissioner,442 F.2d 1343 (4th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court. The factors considered relevant in determining the reasonableness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison *471 of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] See also Commercial Iron Works v. Commissioner,166 F.2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court. No single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v Commissioner,supra.Where officer-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Charles Schneider & Co. v. Commissioner,500 F.2d at 152; Logan Lumber Co. v. Commissioner,365 F.2d 846, 851 (5th Cir. 1966), *472 affg. on this issue a Memorandum Opinion of this Court; Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1156 (1980); Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977). The petitioner contends that the total compensation paid to him as salaries and bonuses from the various corporations must be considered reasonable because of a number of factors. First, he argues that he rendered extraordinary services to the corporations. He controlled all aspects of the business of the corporations and personally made virtually every decision of any significance. In addition, he made all decisions in connection with the acquisition and disposition of property and capital improvements, handled all business negotiations, arranged for financing, and made all decisions relating to business strategy, marketing, advertising, and promotions. He also was responsible for overseeing the legal and accounting work done for the corporations, including all matters in connection with government regulation, and for hiring all station managers. The petitioner stresses that during the year in issue, the retail gasoline industry was highly competitive and in the process of undergoing significant *473 change. He argues that his life-long experience in the retail gasoline business, as well as his imaginative and innovative operation of the stations, enabled the corporations to continue to prosper in spite of difficult business circumstances that were forcing a considerable number of retail gasoline stations out of business. The petitioner also emphasizes his success in negotiating with Mobil as an important element in the profitability of the corporations. He contends that his relationship with Mobil was unique in that he was able to lease multiple stations from Mobil; he was able to purchase a number of stations; and he was able to obtain significant noncancelable competitive price allowances and noncancelable leases and dealer contracts. The petitioner also contends that his compensation must be considered reasonable when compared with comparable salaries paid to executives in comparable positions, the salaries paid to other personnel of the corporations, the gross sales and net earnings of the corporations, and the compensation paid to the petitioner in prior years. Finally, he cites as additional support for his position the fact that he personally guaranteed all of the *474 debts of the corporations and that none of the corporations maintained any profit sharing, pension, or other deferred compensation plans for his benefit during the period of 1972 through 1977. The Commissioner, on the other hand, argues that a number of factors indicate that the compensation paid by the corporations was unreasonable. He lays considerable stress on the fact that at no time from incorporation through the taxable year in issue did any of the corporations pay dividends to any of their shareholders. The Commissioner also stresses the fact that the corporations voted the bounses to be paid to the officer-shareholders in the last month of each year and the fact that the amounts of compensation paid by each corporation to the petitioner and Howard were nearly proportional to their stock interests. In addition, the Commissioner points out that in 1977, officer-shareholders' compensation represented a large portion of the net profits of the various corporations and that in prior years such compensation had also represented a significant portion of corporate net profits.He also emphasizes the fact that the petitioner spent a considerable amount of his time at his home in Florida. *475 He accepts the characterization of the petitioner as the "driving force" behind the corporations. However, he contends that the daily operations of the stations were carried out by the well-paid station managers and the petitioner's son, Mark, and that the amount of compensation allowed in the notices of deficiency adequately compensate the petitioner for his services. The Commissioner further contends that the payment of widely disparate compensation by the corporations, although the petitioner was performing essentially identical services for each corporation, and the payment of compensation to Howard in proportion to his stock interests, even though he spent the bulk of his time working for only one of the corporations, are unjustifiable and indicate dividend distributions. He argues that the petitioner's services cannot be considered sufficiently unique to warrant the compensation paid. Finally, the Commissioner contends that the petitioner has failed to offer credible, reliable evidence of the compensation paid to an executive in a position comparable to the petitioner's and that comparisons between the petitioner's compensation and that of other employees of the corporations *476 should be accorded no weight. After evaluating all the evidence in the present case, we are convinced that the petitioner's services to the corporations were largely responsible for the successful operation of their various enterprises during a time when less fortunate concerns were being forced out of business. We have found as a fact that the petitioner dominated the businesses of the corporations. He made all business decisions of any consequence. In addition, he personally guaranteed loans made to the corporations. See R.J. Nicoll Co. v. Commissioner,59 T.C. 37, 51 (1972). It is true that the petitioner did not show that he worked 8, 10, or 12 hours a day on the businesses of the corporations. Nevertheless, we are persuaded, given the level of detail in which the petitioner involved himself and the resultant multitude of daily evaluations and decisions that he made, that the petitioner rendered substantial services to the corporations. We have found that he devoted some portion of each day to the businesses, whether he was in Chicago or Miami. As we have previously stated, we will not equate one hour of an experienced chief executive's time with that of an employee less *477 experienced. Levenson & Klein, Inc. v. Commissioner,67 T.C. at 713; Smoky Mountains Beverage Co. v. Commissioner,22 T.C. 1249, 1254 (1954). In addition, it is not necessary that an employee be physically present in order to render services to a business. See Ernest Burwell, Inc. v. United States,113 F. Supp. 26 (W.D.S.C. 1953). In the present case, the petitioner, and the petitioner alone, was responsible for the success of the corporations in difficult times. See Ernest Burwell, Inc. v. United States,supra;The Hof Brau Co. v. Commissioner,6 B.T.A. 442, 445 (1927). Under the circumstances, we are convinced that the petitioner's contributions to the success of the business warranted the payment of substantial compensation to him. The petitioner urges us to credit the testimony of his expert witness who testified that, determined on either a corporation-by-corporation basis or an aggregate basis, the compensation paid to the petitioner by the corporations was comparable to, and in some instances less than, those paid to executives of corporations operating retail gasoline stations with comparable gross sales. The Commissioner points out that such expert witness had been the *478 petitioner's accountant and tax return preparer for many years and questions his reliability, alleging that his testimony was so vague that it must be discounted. We admitted and have considered the testimony of such expert because he did have expertise in the gasoline station business, but his relationship with the petitioner is a fact to be considered in judging the weight to give to his testimony. We are not obligated to accept the opinion of an expert witness where the record in the case does not support his conclusions. R.H. Oswald Co. v. Commissioner,185 F.2d 6, 8-9 (7th Cir. 1950), affg. a Memorandum Opinion of this Court; Roth Office Equipment Co. v. Gallagher,172 F.2d 452, 456 (6th Cir. 1949); R.J. Nicoll Co. v. Commissioner,59 T.C. at 49-50. In this case, the opinion of the expert was based on only a few comparable businesses, and there were significant differences between those businesses and the facts of this case. For such reasons, we have not been persuaded to accept the opinion of the expert. Our conclusion that the petitioner was entitled to substantial compensation does not end our inquiry; we must consider and weigh the totality of facts and circumstances, *479 and certain facts militate against our finding that all of the compensation paid to the petitioner was for services rendered.The failure to pay dividends and the payment of very large year-end bonuses are not conclusive indications that the earnings and profits of a corporation were being distributed in the guise of compensation ( Edwin's, Inc. v. United States,501 F.2d 675, 678 (7th Cir. 1974); Laure v. Commissioner,70 T.C. 1087, 1100 (1978), affd. in part, revd. in part, on other issues 653 F.2d 253 (6th Cir. 1981)); but those circumstances warrant special scrutiny ( Edwin's, Inc. v. UnitedStates,supra at 677 n. 5; Charles Schneider & Co. v. Commissioner,500 F.2d at 153). Here, the petitioner was the sole owner of the corporations by the end of the year at issue, and during such year, he and Howard, who was a part owner of some of the corporations during such year, were the only employees to receive bonuses. Moreover, throughout the 1970s, bonuses were paid only to the owners, and the pattern is clear that such bonuses were paid in proportion to the owner's interest in the corporation. In fact, Howard was paid bonuses by each of the corporations in which he owned stock, although *480 he spent most of his time working for B & J Liberty. Since the petitioner and Howard were the owners of the corporations, there is a question as to whether bonuses needed to be paid to them to serve as incentives for increased performance--as owners, they would receive the profits of the business in the same proportions as they received bonuses. See Charles Schneider & Co. v. Commissioner,500 F.2d at 153; City Chevrolet Co. v. Commissioner,228 F.2d 894, 894-895 (4th Cir. 1956), affg. per curiam a Memorandum Opinion of this Court; University Chevrolet Co. v. Commissioner,16 T.C. 1452, 1455 (1951), affd. 199 F.2d 629 (5th Cir. 1952); but see Elliotts Inc. v. Commissioner,716 F.2d 1241, 1248 (9th Cir. 1983), revg. a Memorandum Opinion of this Court. In addition, both the petitioner and Howard received only nominal salaries, and their bonuses were declared in the final month of the year when the earnings of the year were known to them. See Pacific Grains, Inc. v. Commissioner,399 F.2d at 605-607; Ecco High Frequency Corp. v. Commissioner,167 F.2d 583, 584-585 (2d Cir. 1948), affg. a Memorandum Opinion of this Court; Boyle Fuel Co. v. Commissioner,53 T.C. 162, 171 (1969). Finally, *481 the bonuses were not paid pursuant to any formula--the amounts thereof appear to have depended upon the profits of the business and the recipient's ownership interest. The pattern of paying bonuses in this manner constitutes convincing evidence that some part of the payments represented a distribution of earnings and profits. See Pacific Grains, Inc. v. Commissioner,399 F.2d at 605-607; Huckins Tool & Die, Inc. v. Commissioner,289 F.2d 549, 553 (7th Cir. 1961), affg. a Memorandum Opinion of this Court; compare Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. at 1159-1161. Despite that conclusion, the record in this case does not support the Commissioner's determination. He reasoned that the petitioner's services to each of the corporations was roughly equal and determined that such services justified compensation of $10,000 for each corporation. We do not agree. The record shows that much of the work performed by the petitioner was done for the benefit of the gasoline stations-- his negotiations with Mobil that resulted in favorable pricing arrangements and his decisions with respect to the amounts of gasoline to be purchased and the prices to be charged for such gasoline. *482 Some of the corporations operated only a single station, but other operated several stations. In our view, it is more appropriate to allow the petitioner $10,000 of compensation for each station operated by a corporation. Some of the stations also operated car washes and mini-stores. It appears that the operation of those additional businesses must have added to the petitioner's managerial responsibilities, but we have scanty evidence concerning his connection with those activities. It does appear that the car washes constituted a substantial activity, and accordingly, it is appropriate to allow him an additional $5,000 of compensation from each corporation which operated a car wash. We know so little about the scope of the mini-stores and the petitioner's responsibilities with respect to them that we are not justified in allowing him additional compensation for such activities. The second issue for decision is whether the petitioner received constructive dividends from some of the corporate petitioners during 1977 as a result of their paying certain travel and entertainment expenses. The corporations have conceded that such expenses are not deductible by them because they cannot *483 substantiate the expenses in accordance with the requirements of section 274. However, the petitioner argues, citing Ashby v. Commissioner,50 T.C. 409 (1968), that even though the substantiation requirements of section 274 were not met, such payments are not necessarily constructive dividends. He contends that the record demonstrates that the travel and entertainment expenses were for the primary benefit of the corporations and should not be treated as dividend income to him. The Commissioner maintains that the petitioner has failed to prove that such expenses were not incurred for his personal benefit. The petitioner testified that he reimbursed the corporations for any personal expenditures and that the remaining expenses were incurred primarily to benefit the corporations. He also testified that some of the expenses were actually the expenses of Howard, and therefore, he argues that such expenses cannot be a constructive dividend to him. However, on the record before us, we agree with the Commissioner. Other than his assertion that some of the expenses paid by the corporations were Howard's, the petitioner has not shown what expenses he incurred and what expenses were incurred *484 by Howard. In addition, the petitioner's testimony on this issue was vague and conclusory as to the purposes of the expenditures. For this purpose, the requirements of section 274 are not applicable. Nevertheless, we remain cognizant that travel and entertainment expenses are of such nature as to afford considerable opportunity for abuse, and it is not too much to ask of a taxpayer seeking to prove them that he offer reasonably satisfying proof not only that the expenses were in fact incurred, but also that such expenses were in fact incurred on behalf of the corporation. See Hearn v. Commissioner,36 T.C. 672, 674 (1961), affd. 309 F.2d 431 (9th Cir. 1962); Walet v. Commissioner,31 T.C. 461, 471 (1958), affd. per curiam 272 F.2d 694 (5th Cir. 1959). The Petitioner's evidence wholly fails to meet such a standard of proof, and thus, we conclude and hold that he has failed to carry his burden of proof that the expenses did not constitute constructive dividends. Welch v. Helvering,290 U.S. 111 (1933). Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners have been consolidated herewith: 5300 Car Wash Company, docket No. 11390-81; B & J Liberty Super Service Station, Inc., docket No. 11391-81; Jim's Friendly Service Station, Inc., docket No. 11392-81; Lincoln-Talman Service Station, Inc., docket No. 11393-81; Hasti Car Wash Company, docket No. 11394-81; James C. Neumann, docket No. 11395-81; James C. Neumann and Marilyn Neumann, docket No. 11396-81; Eagle Super Service Station, Inc., docket No. 11397-81.↩
2. In computing the amount of dividend income in his notice of deficiency issued to the individual petitioners, the Commissioner did not include the $42,000 disallowed as reasonable compensation in computing the deficiency of Capri Oil Company. It may be that most of this amount was paid in 1978 and thus would not be includable as income in 1977. 3. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.
4. See footnote 2.↩